689 P.2d 767

**STATE of Idaho, Plaintiff-Appellant,**

v.

**Michael Robert JOBLIN, and**

**Kenneth Andrew Joblin, Defendants-Respondents.**

No. 14818.

Supreme Court of Idaho.

Oct. 17, 1984.

Jim Jones, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-appellant.

Klaus Wiebe, Boise, for defendants-respondents.

BISTLINE, Justice.

On August 9, 1979, Christopher Goff was stabbed to death by a burglar he was chasing from the house of a friend. At the request of the owners, Goff and his roommate, Tony Marten, were watching a house across the street from where they lived. On the evening of August 9, Marten saw a person enter the friend's house. He and Goff immediately went to ivestigate. After the two men entered the house, the suspected burglar came out of a bedroom, ran past Goff and Marten and fled out the door. Marten pursued the intruder on foot, while Goff ran for his car. During the ensuing chase Goff battered the intruder with his car and knocked him to the ground. The thief recovered from the fall and fled again. Goff exited his car and gave chase on foot, joining Tony Marten. Within moments Goff cornered the thief against a fence. When Goff moved in, the man lunged at him stabbing him in the chest. The assailant ran away while Tony Marten sought help. Chris Goff died shortly thereafter.

That same evening Tony Marten provided the Boise police several general descriptions of the killer. In these descriptions the assailant varied in height from five feet six inches to six feet two inches, in weight from 175 pounds to 200 pounds, in age from 19 to 21 years old, and hair color ranged from brown to sandy blond. In all of the descriptions the killer was a caucasian male, wearing a short-sleeved button-up dark blue shirt and dark blue pants (levis). Marten was unable, immediately following the incident, to provide the police with a more detailed description of the assailant, and could not describe the assailant's facial features or any other distinguishing features. Tr., April 21 and 22, 1982, p. 7, L. 20; p. 12, L. 9; p. 48, L. 25; Defendant's Exhibit 4. *See also*, Respondent's Brief, pp 2–3.

On August 29, 1979, Marten was placed under hypnosis by a Boise police officer. The purpose of the session was to have Marten describe in more detail the events on the evening of the homicide, and hopefully to provide a more detailed description of the killer's face. Unfortunately, during the hypnotic session, Marten was unable to recall any details of the killer's face, even after repeated questioning by the hypnotist-officer. Defendant's Exhibit 11, Video Tape of Hypnosis of Tony Marten. During the session the hypnotist made numerous suggestions to Marten that he (Marten) would be able to see the assailant more clearly, including a clearer picture of the assailant's face. Even with this prompting Marten was unable to provide the officer with a description of the killer's face. The hypnotist-officer then decided to terminate the session, but not without giving Tony Marten a post-hypnotic suggestion regarding Marten's ability to visualize the assailant's face. The session ended with the following suggestions:

"[OFFICER] ANDERSON: We're going to go back and touch on one or two other areas. Stay away from concentrating on the man's face. You are going to find the more you think about it, whether it is during the session or after the session, you are going to be able to concentrate a great deal about what the man looked like. You will be able to get more and more and more of a picture of what the man looked like all the time.

"In a minute we're going to take you out of this state of relaxation. Before we do, I want to tell you that you have been extremely helpful and that you've been very cooperative and you've done an excellent job. And that in the future, you are going to be able to get visual images of what this guy looked like and you will be able, from time to time, to put the picture more clearly together. And those times when you do, we want you to get in touch with our office and let us know so we can sit down with you and try to develop a little bit better idea of what the guy looks like."

Defendant's Exhibit 11, Video Tape of Hypnosis.

Sometime between late August and December of 1979, a photo line-up was shown to Marten. The Boise police officers involved in the murder investigation gave conflicting testimony regarding the date of the photo line-up. One officer believed the photo line-up was shown to Marten before the hypnosis session, while another officer thought the photo line-up occurred after the session. Marten was unable at the photo line-up to make a positive identification of the assailant. Tr., April 21 and 22, 1982, pp. 56, 60, 63, 68, and 78.

In December 1979, or early January, 1980, the Prosecutor's office placed the case on inactive status where it remained for nearly two years.

In September, 1981, the Boise police received a Crime Stoppers call regarding the Goff murder. Following this lead an officer spoke with several individuals who indicated that Tony Marten was now able to identify the killer. On November 5, 1981, the officer investigating the Goff murder discovered Tony Marten in jail on some traffic violations. At that time the officer spoke with Marten about the case indicating that Mike and Kenneth Joblin were suspects. Marten told the officer that he too believed the Joblin brothers were suspects, having heard rumors to this effect approximately one or two months before this conversation. Marten indicated that he had been told by Elaina Wills (one of the occupants of the house burglarized by the murderer) that she believed the Joblins had done it. She had given Marten a piece of paper with Mike and Ken Joblin's names, addresses and a description of their car. She encouraged Marten to look for them and may have discussed their physical description with Marten.

After this conversation with the officer Tony Marten wrote out the following statement on November 5, 1981:

"I'm certain that if I saw the suspect in question that I would recognize him. I really believe that it was the Joblin brothers involved. ... I feel that I got a good enough look at him that I could pick him out."

Defendant's Exhibit 6.

On November 12, 1981, the police conducted an in-person line-up for Tony Marten. Both of the Joblin brothers were members of the line-up crew. This line-up was conducted in a suggestive manner, with Mike Joblin being touched and addressed by the officer in charge. Other members of the line-up crew were addressed by the officer, but in a far less suggestive way. Mike Joblin was charged with First Degree Murder after Tony Marten identified him as the assailant. On February 3, 1982, the preliminary hearing was held, after which the defendant was held to answer to the charge in Fourth District Court.

The matter proceeded to trial with various motions and evidence heard by the court. A hearing was held on October 21, 1982, pursuant to defendant's Motion in Limine to obtain an order preventing the admission at trial of any evidence or testimony pertaining to any pre-trial or in-court identification of the defendant by Tony Marten. After testimony of defendant's witness regarding the impact of a post-hypnotic suggestion, admission of various items of evidence, and argument by counsel, the trial court ordered an in-court identification by Tony Marten would not be permitted. R., Vol. 2, p. 116. The trial court concluded that the post-hypnotic suggestion, combined with the suggestive in-person line-up, created an influenced mind in Tony Marten. Thus, Marten's identification of Mike Joblin was not the result of his genuine perceptions and recollections. Without the identification testimony of Tony Marten the state was unable to proceed with the case against Mike Joblin.

On appeal the state contended that Tony Marten's memory was not enhanced during the hypnotic session and should not be judged by the admissibility standards established for hypnotically enhanced testimony. Appellant's Brief, p. 11. The state also contended that the in-person line-up was not sufficiently suggestive to create a very substantial likelihood of misidentification, therefore the witness (Marten) should

have been allowed to make an in-court identification. A trial judge has wide discretion in determining the competency of witnesses, and barring abuse of that discretion the decision of the trial court will not be overturned. The conclusion of the trial judge here was that post-hypnotic suggestion, coupled with an extremely suggestive line-up improperly influenced the witness's memory. We are not persuaded of any error in that ruling.

The state's position on appeal was based on two arguments. First, the state argued that the witness's memory was not enhanced during the hypnotic session, hence it should not be judged by the admissibility standards established for hypnotically enhanced testimony. Second, the state argued that the pre-trial line-up was not sufficiently suggestive to create a very substantial likelihood of misidentification and therefore, the defendant's identification should not have been suppressed. These arguments will be addressed accordingly.

### I.

We find ourselves in agreement with the state regarding the enhancement of the witness's memory. It is clear from the record that Tony Marten's memory was not enhanced by the hypnosis session. The problem with Marten's memory resulted from a post-hypnotic suggestion, not enhancement. Both of these phenomena can result from a hypnosis session. The memory enhancement process alters the witness's memory by addition of information gathered during the hypnosis session. A post-hypnotic suggestion, on the other hand, suggests to the witness an idea or event which the witness can conceive or expect *after* the hypnotic session. Through the use of post-hypnotic suggestions a witness will be motivated to meet the requirement of the suggestion after the hypnotic session is over. The unreliability of Tony Marten's identification of Mike Joblin at the in-person line-up resulted from the post-hypnotic suggestion given to Marten during the hypnosis session, not from memory enhancement. Marten was

told that in the future he would have a clearer picture of the assailant, and that through time his visual image of the killer would improve. It would appear from the record that Tony Marten responded to the suggestion in an admirable fashion: Although in the months immediately following the killing, Marten was unable to identify the murderer either through a detailed description or in a photo line-up, yet, two years after the incident and the hypnosis session, Marten became able to identify Mike Joblin with a high degree of confidence.

The problems with hypnotically induced testimony were addressed by this Court in *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984):

"Accordingly, we adopt our own rule on the admissibility of hypnotically induced testimony, rejecting each of the *per se* rules set out above. We adopt this rule with the intent of giving guidance to trial judges grappling with the difficult question of the admissibility of hypnotically induced or enhanced testimony. There needs to be some method of determining the admissibility of this type of testimony that will protect against the dangers of hypnosis, particularly the dangers of cueing and confabulation, and yet allow for receipt of the benefits of memory recall which hypnosis can produce. Thus, we adopt a rule wherein trial courts are directed, in cases where hypnosis has been employed, to conduct pretrial hearings on the procedures used during the hypnotic session in question. Trial judges should then apply a 'totality of the circumstances' test and make a determination whether, in view of all of the circumstances, the proposed testimony is sufficiently reliable to merit admission. If the witness's memory seems to have been altered in such a way as to render it unreliable, the trial court may rule the witness to be incompetent. We feel that some safeguards should be outlined to give trial courts guidance on what elements they should look for in applying this test. We adopt the follow-

ing modified version of the Orne safe-guards, for the general guidance of the trial courts.

(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory, so as to aid in the prevention of cueing and improper suggestion.

(2) The person conducting the session should be independent from either of the parties in the case.

(3) Information given to the hypnotist by either party concerning the case should be noted, preferably in written form, so that the extent of information the subject received from the hypnotist may be determined.

(4) Before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject, avoiding adding new elements to the subject's description.

(5) The session should be recorded so a permanent record is available to ensure against suggestive procedures. Videotape is a preferable method of recordation, but not mandatory.

(6) Preferably, only the hypnotist and subject should be present during any phase of the hypnotic session, but other persons should be allowed to attend if their attendance can be shown to be essential and steps are taken to prevent their influencing the results of the session, (i.e., they are not allowed to participate in the session, etc.).

This 'totality of the circumstances' rule should be applied whether the hypnotized witness is produced by the plaintiff or defendant."

*Iwakiri, supra,* at 625, 682 P.2d at 578. The actions of the trial judge in this case conform to these guidelines remarkably well. Prior to the admission of any testimony the trial court held a hearing to determine if the testimony was sufficiently reliable to merit admission. Based on testimony and exhibits offered at that pre-trial hearing the trial judge determined the wit-

ness, Tony Marten, was not competent to testify because of the confluence of the post-hypnotic suggestion and the very suggestive line-up. R., Vol. 1, pp. 65–68. It is a well-settled rule of law that the competency of a witness to testify concerning a particular matter is for the trial judge to determine. *State v. Fenley,* 103 Idaho 199, 646 P.2d 441 (Ct.App.1982); *State v. Holm,* 93 Idaho 904, 478 P.2d 284 (1970). A decision of the trial court will not be set aside absent an abuse of discretion. *State v. Fenley, supra.* The trial judge did not abuse his discretion when he determined Marten was incompetent to make an in-court identification.

The most significant danger of hypnotically induced testimony is the loss by the defendant of his Sixth Amendment right to confrontation. Both the courts and scholars studying the problems with hypnotically induced testimony have recognized that the defendant will lose his ability to effectively cross-examine a previously hypnotized witness because of confabulation, suggestions, and additions to the witness's memory which "harden" over time. *State v. Mena,* 128 Ariz. 226, 624 P.2d 1274 (1981); *State v. Mack,* 292 N.W.2d 764 (Minn.1980); Diamond, Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness, 68 Calif.L.R. 313 (1980); Spector and Foster, Admissibility of Hypnotic Statements: Is the Law of Evidence Susceptible? 38 Ohio St.L.J. 567 (1977). The hypnotized witness becomes so convinced of this newly acquired or suggested information which has filled in the gaps in his memory, that he can no longer distinguish between original memory and induced memory. Even the prosecutor in this case admitted during hearing that if you accept the scientific theory that a hypnotized witness "will confabulate or make up memories and then will feel reassured in those memories or even later make up memories, feel assured, then you can't effectively cross-examine and you deny him his Sixth Amendment rights." Statement of Dennis Johnson, R., Vol. 1, p. 59. Cross-examination of this type of highly confident witness is meaningless. *State v.*

356

*Mack, supra,* at 769; *State v. Mena, supra,* 624 P.2d at 1278. Without effective cross-eximaination the defendant's constitutional right to confrontation is abrogated.

## II.

■ Pre-trial line-up procedures must be carefully conducted to avoid misidentification by the witness. *Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972). As the Court in *Biggers* indicated, "[i]t is the likelihood of misidentification which violates a defendant's right to due process, and it is this which [is] the basis of exclusion of evidence ...." *Id.* at 199, 93 S.Ct. at 381–82. At the center of the problem is the question of whether the identification was reliable, despite a suggestive confrontation procedure. In reviewing cases involving suggestive line-ups, the United States Supreme Court has fashioned a "totality of the circumstances" test as set forth in *Stovall v. Denno,* 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967), and followed in *Biggers, supra.* The Court, in *Biggers* outlined the implementation of this test:

> "We turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation."
>
> *Id.* 409 U.S. at 199, 93 S.Ct. 382.

■ Under this test, the trial court's ruling that the identification of Mike Joblin by Tony Marten was unreliable is upheld. According to the witness's own admission his opportunity to view the assailant at the time of the crime was limited due to poor light conditions. Tr., April 21 and 22, 1982, pp. 163–66. The witness's degree of attention is questionable because of his heightened state of excitement during the chase. The witness was unable to give the police anything more than a general description of the killer immediately after the crime, and was *not* able to pick out the assailant in a photo line-up conducted within one month of the crime. But, at the in-person line-up conducted over two years after the commission of the crime, the witness was able to identify the defendant with a high degree of confidence. Tr., April 21 and 22, 1982, p. 149. In considering all of these factors, the trial court was correct in determining that the witness's pre-trial identification was not reliable:

> "Considering the substantial lapse of time, the poor conditions for observation, there is no reason to believe that the identification several years after the event could be based upon anything other than an influenced mind. The surety and clarity of the identification that is represented at this point is almost certainly a product of some influence other than the witness's genuine perceptions and recollections."
>
> R., Vol. 1, pp. 67–68.

■ Finally, the trial court's decision to prohibit an in-court identification by this witness was correct. It is established in Idaho, that once the court rules the pre-trial identification inadmissible, the witness can make an in-court identification *only* if the prosecution can establish by clear and convincing evidence that the identification derives from a source which is independent of or sufficiently distinguishable from the improper line-up. *State v. Sadler,* 95 Idaho 524, 511 P.2d 806 (1973). The state has failed to demonstrate by clear and convincing evidence that Tony Marten's identification of the defendant is independent of the suggestive line-up, thus the trial court's denial of this testimony by the witness was proper.

*Affirmed.*

HUNTLEY, J., concurs.

DONALDSON, C.J., and SHEPARD and BAKES, JJ., concur in the result.

BAKES, Justice, concurring in the result:

I concur in the result reached by the plurality opinion of Justice Bistline, and write only to point out that today's plurality opinion does not change or modify either the result or the rationale of the majority opinion in *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984).

DONALDSON, C.J., and SHEPARD, J., concur.