# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.R. MCFARLANE, M.C. HOLIFIELD, K.J. BRUBAKER**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

v.

**D. W. B.[1]**
**SERGEANT MAJOR (E-9), U.S. MARINE CORPS**

**NMCCA 201400359**
Review Pursuant to Article 62(b), Uniform Code of Military Justice,
10 U.S.C. § 862(b)

**Military Judge:** Col M.B. Richardson, USMC.
**Convening Authority:** Commanding General, 1st Marine Division (Rein), Camp Pendleton, CA.
**For Appellant:** LT Ann E. Dingle, JAGC, USN; LT James M. Belforti, JAGC, USN.
**For Appellee:** LT Jessica L. Ford, JAGC, USN.

**26 February 2015**

---
**PUBLISHED OPINION OF THE COURT**
---

BRUBAKER, Judge:

This case is before us on an interlocutory appeal by the United States under Article 62, Uniform Code of Military Justice, 10 U.S.C. § 862, and RULE FOR COURTS-MARTIAL 908, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.). The appellee is currently charged with sodomy with a child under the age of 12 and two specifications of indecent acts with a child in violation of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925 and 934.

---

[1] The name of the appellee has been withheld from this opinion to protect the privacy interests of the alleged victim, whose identity would otherwise be apparent.

In this appeal, we grapple with a complex and controversial topic: the admissibility of a witness's testimony regarding memories recovered through a psychotherapeutic approach known as Eye Movement Desensitization and Reprocessing (EMDR). In a pretrial motion, the appellee sought to exclude the testimony of KB, the alleged victim in this case, asserting her memories of abuse surfaced only after undergoing EMDR in a manner that tainted KB's memories and rendered them unreliable. The military judge, after receiving briefs from both parties and conducting a "*Daubert*-type"[2] hearing, granted the motion and ordered KB's testimony suppressed. The Government filed a timely written notice of appeal. It asserts the military judge abused his discretion by applying a scientific standard to lay testimony.

After carefully considering the superbly litigated record, the military judge's findings of fact and conclusions of law, and the submissions of the parties, we find the military judge did not abuse his discretion in concluding that KB's testimony was the product of a tainted and highly suggestive psychological process, and therefore inadmissible.

**Jurisdiction**

Both parties agree that we have jurisdiction to act on this interlocutory appeal. Article 62(a), UCMJ, provides that in a court-martial in which a punitive discharge may be adjudged, the United States may, so long as it files timely notice, appeal an order or ruling by a military judge which "excludes evidence that is substantial proof of a fact material in the proceeding." Those criteria are plainly met here.

**Background**

KB is the biological daughter of the appellee and LB, the appellee's wife until their divorce in 2002. KB was two years old when her parents divorced. LB and the appellee thereafter shared custody of KB.

When KB was around seven years old, she began experiencing stomach and anxiety problems. Around 2011, medical doctors, who had been unable to find a physical cause, recommended psychological treatment. KB cycled through at least two other psychologists — without any allegations of abuse surfacing —

_____

[2] Appellate Exhibit XXXVI at 1 (referencing *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)).

2

before starting treatment with Dr. Bhattacharya around November 2012. At that time, KB was about 12 years old. LB researched and found Dr. Bhattacharya in part because of her specialization in dealing with children who see spirits and ghosts, something KB had been experiencing.[3]

Dr. Bhattacharya incorporated spiritual aspects into her practice, including psychic abilities, ghosts, crystal therapy, and resources and treatment for "Indigo[4]/Crystal/Star people/Rainbow population."[5] She herself, she advertised, was "an Indigo who evolved to Crystal phase" and was "clairvoyant, clairsentient, clairaudient, and claircognizant."[6] Dr. Bhattacharya asserted the ability to distinguish between patients who were seeing visions as a result of psychosis versus "true angels/clairvoyan[ts]/clairaudients."[7] She asserted KB was an indigo child and encouraged her to trust in what she saw, felt, and heard, and to explore her psychic gift.

Dr. Bhattacharya and KB expressed they had "shared flashes"[8] where they saw the same vision at the same time. During one session, KB had a vision of ghosts of her grandfather and others; Dr. Bhattacharya indicated she too saw the same three ghosts and described one. Later, KB brought in a family photograph and Dr. Bhattacharya pointed to the one she had seen in the vision. KB indicated that was her grandfather's best friend.

From very early in KB's life, LB suspected the appellee was sexually abusing their daughter. According both to LB's testimony and KB's forensic interview,[9] LB frequently asked KB

---

[3] KB described it as hearing voices and seeing "shadows." Record at 280.

[4] According to exhibits offered in the record, the term "indigo person" refers to the color of a person's electromagnetic field. Those classified as indigo are said to be, among other characteristics, "[i]ntuitive or psychic, possibly with a history of seeing angels or deceased people." AE XVII at 99.

[5] *Id.* at 95.

[6] *Id.* at 97.

[7] Record at 99-100.

[8] *Id*. at 107.

[9] KB contradicted her forensic interview during her testimony at the hearing, indicating her mother had never informed her of or asked questions about any suspicions of abuse. As the military judge found, however, this appears to be contrary to all other evidence on this point.

after visitation with her father whether anything "weird"[10] or "awkward"[11] had happened while with her father. In fact, KB indicated this would happen every time she got back from visiting the appellee. KB thought it was "really weird"[12] that her mother was asking her that; KB "kept asking [LB] why she was asking me that."[13] LB would reply that the appellee had been investigated for doing "things"[14] to other people but did not provide more detail. KB indicated, however, that about "a year ago or so"[15] (from the forensic interview of 16 September 2013), she learned from her mother more specifically that the appellee had been investigated for "doing things"[16] to the children of another ex-wife, adding, "That's always been in the back of my mind, like I never really thought about it."[17]

LB also shared her suspicions with Dr. Bhattacharya. In December 2012, she told Dr. Bhattacharya about the prior investigation and provided her a copy of a Naval Criminal Investigative Service (NCIS) investigation into the allegations.[18] She also related specific stories to Dr. Bhattacharya indicating she suspected the appellee had sexually abused KB from the time KB was a toddler in diapers.

Dr. Bhattacharya incorporated EDMR into her therapy with KB. EMDR is a psychotherapeutic approach developed after its founder, Dr. Francine Shapiro, discovered in 1987 that eye movement appeared to reduce negative emotion associated with distressing memories. It is an eight-phase process, one of which is "desensitization," where the therapist engages the subject in bilateral stimulation of the brain: the subject is told to focus on the negative thought or trauma while simultaneously focusing on a repetitive external stimulus. The most common stimulus is eye movement, where the subject moves

---

[10] AE XVII at 93, 94.

[11] *Id.* at 94.

[12] *Id.* at 93.

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] These allegations, dating back to the mid-1990s, were never prosecuted.

his or her eyes back and forth following the therapist's fingers or an electronic display, but can include other external stimuli such as tapping or auditory tones. The clinician then "instructs the client to let his/her mind go blank and to notice whatever thought, feeling, image, memory, or sensation comes to mind."[19] In EMDR, a subject remains in an associative state — aware of one's present surroundings — distinguishing it from hypnosis, where a subject is put into a trance-like state of altered consciousness.

Dr. Bhattacharya held several EMDR sessions with KB, initially focusing on other issues, such as processing KB's grief regarding the loss of her grandfather. Later, however, therapy became focused on KB's discomfort with the appellee. In a session conducted in approximately July or August 2013, Dr. Bhattacharya had KB focus on why she felt uncomfortable around her father and where in her body she felt pain while KB followed Dr. Bhattacharya's fingers. As she did this, KB experienced a "flash" of memory in which she recalled being sexually abused by her father when she was approximately seven years old. KB described being called into a room by the appellee, being on a bed with him, him sitting on her chest and placing something into her mouth, and experiencing pain. According to KB, Dr. Bhattacharya told KB she saw this vision as well. At the hearing, Dr. Bhattacharya denied this.

Shortly after the session, Dr. Bhattacharya told LB that KB had made disclosures of sexual abuse. According to LB, she asked KB for details, but initially KB would not talk about it. A short time went by, during which LB and KB believe another EMDR session occurred. According to LB, she brought the topic up a lot with KB until, in a heated confrontation, KB finally told LB that the appellee had sexually assaulted her and provided further details.

KB claims she always had thoughts "in [her] head"[20] that something happened between herself and the appellee, but it was nothing specific and that prior to the July/August 2013 EMDR session, she had no conscious memory of any abuse.[21]

---

[19] AE XVII at 109.

[20] Record at 272.

[21] *Id.* at 298.

5

Two experts testified at the hearing on the motion to suppress KB's testimony. Ms. Gilman, a licensed marriage and family therapist with extensive experience and training in EMDR, testified for the Government. She explained that EMDR has been the subject of numerous studies and is internationally recognized and approved as a valid and successful form of therapy, particularly for Post-Traumatic Stress Disorder (PTSD), anxiety, and other trauma. Organizations recognizing it include the American Psychiatric Association, the U.S. Department of Veteran Affairs, the Department of Defense, the World Health Organization, and many others. The EMDR International Association, of which Ms. Gilman was the president for a year, is a professional organization that offers training, certification, and protocols for the proper use of EMDR.

Ms. Gilman said EMDR activates an intrinsic system, possibly the same used during rapid eye movement sleep, to help patients process information that previously had been "logjam[med]"[22] due to trauma. Unprocessed fragments of information can lead to adverse effects such as "intrusive thoughts and images, negative beliefs and disturbing body sensations."[23] EMDR helps link these fragments, integrate them in a healthy manner, and eliminate or reduce symptoms of post-traumatic stress.

Ms. Gilman found amnesia in trauma patients common and that EMDR can help a patient make linkages in his or her memory. The focus of EMDR, however, is clinical, not forensic. Therefore, while clinicians are taught to believe in the *validity* of whatever may come up during EMDR —— meaning that the patient actually is making that linkage —— substantiating evidence would be necessary to assess the historic *accuracy* of a particular memory. While she asserted the process of EMDR does not produce false memories, it has the potential to link memories not actually linked in reality. Further, Ms. Gilman stated that parents and clinicians can influence and perpetuate the interpretation of a memory.

Ms. Gilman, having reviewed Dr. Bhattacharya's work with KB, testified that she had concerns about the way EMDR was applied in this case, specifically: (1) whether Dr. Bhattacharya adequately explained the process of EMDR to KB in order to prepare and "stabilize" her; (2) that Dr. Bhattacharya's previous unconventional discussion of spiritual realms and

---

[22] *Id*. at 337.

[23] *Id*. at 336.

entities with KB is outside established protocol for the use of EMDR and diminishes the validity of the method; and, (3) the risk of perceived validation[24] of KB's recall through the spiritual discussions and by making comments that communicate "this is accurate" as opposed to "it's okay, keep going." Finally, Ms. Gilman explained that in situations where a client leaves an EMDR session still vulnerable to the recall of undiscovered memories outside the therapy session, the insertion of another influential person (such as LB) could impact the associations formed by the client while still under the influence of the EMDR session.

The defense called Dr. Younggren, a forensic psychologist with expertise in the realm of memory, specifically traumatic memory. He first addressed the malleability and potential contaminants of memory in general and, contradicting Ms. Gilman, expressed that amnesia is rare in trauma cases. He stated that, while sometimes unable to retrieve details, people generally remember core events, in other words, they have at least a "gist memory"[25] that, for example, they were sexually assaulted.

Dr. Younggren reaffirmed EMDR's known effectiveness in the treatment of PTSD, but challenged Ms. Gilman's assertion that EMDR does not produce false memories. He explained that any therapy could produce false memories, and that these memories can be "valid" in the emotional sense that the patient believes them to be true, but not "valid" in the sense the memory is factually accurate. In support of that notion, Dr. Younggren cited the official position of the American Psychological Association that people can develop complex memories for experiences that never actually happened. Dr. Younggren stated EMDR is more likely to retrieve details peripheral to a gist memory (such as physical characteristics of an assailant) than a gist memory itself (such as that a person was sexually assaulted). He stated he was unable to find any scientific literature supporting the notion that EMDR is effective in accurately retrieving gist memories of traumatic events.

Dr. Younggren also provided his opinion on the treatment applied in this case. While conceding that EMDR did not make KB's testimony *per se* inaccurate, he was highly critical of Dr.

---

[24] Ms. Gilman described "perceived validation" as a client's misinterpretation of a clinician's movements or words as approval of what the client has reported due to an unduly familiar relationship or previous shared experience with that clinician.

[25] Record at 404.

Bhattacharya's practices: "The EMDR might've been done exactly properly, but there's so much role conflict and loss of objectivity and unprofessional conduct in this [case] that I'm stunned."[26] He expressed that integrating psychic abilities and spiritual aspects into psychotherapy, whether one believes in those phenomena or not, is outside mainstream psychology and is "a confusion of roles that we have strict prohibitions against."[27] Dr. Younggren explained that the potential issues of suggestibility and validation of KB's own memories by Dr. Bhattacharya may have led to the contamination of those memories. He emphasized that therapists gathering information from children must adhere to a certain protocol or risk damage through the manner of their questioning. Dr. Younggren expounded on this protocol, saying that clinicians should not ask suggestive or leading questions, must be neutral and not integrate supplementary information so that the child can provide his or her own narrative, and should avoid repeating questions because doing so risks a child's perception that their first answer was incorrect.

## Analysis

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Sanchez*, 65 M.J. 145, 148 (C.A.A.F. 2007). We will not set aside a discretionary determination unless we have "a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citation omitted). When ruling on admissibility of scientific evidence, "[t]his standard 'applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion.'" *Sanchez*, 65 M.J. at 149 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) he fails to properly follow the appropriate legal framework; or (3) his application of the correct legal principles is clearly erroneous. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010).

---

[26] *Id.* at 412.

[27] *Id.*

I.   Legal Framework

MILITARY RULE OF EVIDENCE 104, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.), requires a military judge to decide preliminary questions about whether evidence is admissible.  The parties, while not disputing this, disagree on the appropriate legal framework the military judge should have applied in deciding the preliminary question of admissibility of KB's testimony.

The Government argues the military judge misapplied a legal framework germane to expert witnesses, grounded in MIL. R. EVID. 702, *Daubert*, and *Houser*, to analyze admissibility of "factual testimony of a lay witness,"[28] which, it asserts, is governed only by rules of relevance, unfair prejudice, and competence under MIL. R. EVID.  401, 403, and 601.  It argues, in short, that whether and by what method a witness's memory may have been recovered or refreshed goes strictly to the weight of the testimony, not admissibility.

This is a logical argument and generally true.  Witnesses with personal knowledge of the matter at issue are presumed competent to testify.  MIL. R. EVID. 601-02.  This rule is intended to be expansive and "to provide court members with the greatest amount of arguably reliable evidence possible, with the expectation that court members can decide the appropriate weight to be given imperfect witnesses."  SALTZBURG, SCHINASI AND SCHLUETER, MILITARY RULES OF EVIDENCE MANUAL, § 601.02[3] (7th ed., Matthew Bender & Co. 2011).

MIL. R.EVID. 702 insists on reliability as a condition for admissibility, but on its face applies to *opinion* evidence by *expert witnesses*.  The leading Supreme Court and U.S. Court of Appeals for the Armed Forces cases addressing scientific evidence — *Daubert* and *Houser* — interpret and apply MIL. R. EVID. 702 and its close Federal analogue; hence, while both require a reliability determination before admitting scientific evidence and provide factors for a trial judge to consider, they too on their face apply to expert witnesses.  *Daubert*, 509 U.S. at 592-94; *Houser*, 36 M.J. at 397.

To further bolster its argument, the Government cites *United States v. Geiss*, 30 M.J. 678 (A.F.C.M.R. 1990).  There, the Air Force Court of Military Review addressed whether the military judge erred by denying a defense motion to suppress a sexual assault victim's testimony because it was unreliable and

---

[28] Appellant's Brief of 28 Oct 2014 at 10-11.

tainted by suggestive Government practices.  Affirming, the court held that "evidence of suggestive questioning or coercive pretrial interviews goes to the credibility of a witness rather than to the admissibility of testimony."  *Id.* at 681.

The appellee counters that *Geiss* did not involve testimony based on memory recovered through a scientific process — a critical distinction from the case at bar.  He asserts KB's memories of abuse were the direct result of EMDR and that the accuracy of her recollection cannot be separated from the underlying method by which the previously-repressed memories were recovered.  He states that "[b]ecause the genesis of [KB's] memories was the result of a psychological process, it was proper for the military judge to require a hearing into the reliability of the underlying procedure that led to their recall."[29]  This is aptly stated and we agree.

In 1923, the Court of Appeals for the D.C. Circuit held that testimony to the results of a precursor to the modern polygraph machine was inadmissible, enunciating what for decades was to be the "dominant standard"[30] for assessing admissibility of scientific evidence: "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923).

Seventy years later, the Supreme Court held the *Frye* "general acceptance" test was superseded by the intervening FEDERAL RULE OF EVIDENCE 702.[31]  *Daubert*, 509 U.S. at 587–88. Interpreting the Rule, the Court abolished the "general acceptance" test as no longer "an absolute prerequisite to admissibility."  *Id.* at 588.  The court nonetheless emphasized that displacement of the *Frye* test by the FEDERAL RULES OF EVIDENCE "does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence.

---

[29] Appellee's Answer of 13 Nov 2014 at 9.

[30] *Daubert*, 509 U.S. at 585.

[31] FEDERAL RULE OF EVIDENCE 702 provided: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony *or evidence* admitted is not only relevant, *but reliable*." *Id.* at 589 (emphasis added) (footnote omitted).

A key question, then, is whether a lay witness's testimony to memories recovered through EMDR constitutes "scientific evidence" and is therefore subject to a pre-admissibility reliability determination. In addressing this, we wade into what the military judge aptly called "a fierce debate."[32]

As a relatively new procedure, no military cases and very few civilian cases address EMDR at all, let alone the issue presented here. There is, nevertheless, a significant body of law addressing the admissibility of memories recovered through other psychological processes — most prevalently hypnosis, which has a far longer history.

There are, concededly, important distinctions between hypnosis and EMDR. Hypnosis involves placing a subject in an altered state of consciousness while EMDR is designed to keep the subject in an associative state, or a state of full consciousness. Also, hypnosis is frequently used as a deliberate tool to aid subjects with their memory, whereas while EMDR may lead to memory recovery as a side effect, its main purpose is to assist subjects in processing an already-remembered trauma.

Still, there are shared concerns with both hypnosis and EMDR: (1) An increase in suggestibility, that is, suggestions or impressions from a therapist or an outside authority figure may pollute the process and affect a patient's memory; (2) Validation: a therapist's verbal or non-verbal responses may lead a patient to believe the therapist has affirmed the factual accuracy of a thought or memory; and, (3) Memory hardening where a patient cements a memory in his or her mind as factual truth after believing it has been validated through a psychological process.

More importantly, differences between EMDR and other psychological processes weigh more toward a court's analysis of an outcome — whether and to what degree a distinct process is reliable — than the threshold question of whether reliability of a psychological process is even relevant to admissibility. We thus find cases addressing hypnosis and other processes

---

[32] AE XXXVI at 9.

highly probative to this threshold question and begin by examining them.

Courts addressing the admissibility of testimony regarding memories recovered or enhanced through psychological processes fall into three broad categories: (1) those finding testimony regarding memories enhanced or recovered through a particular psychological process *per se* inadmissible; (2) those finding such testimony admissible subject to a case-by-case *in limine* determination of reliability; and (3) those finding such testimony *per se* admissible, i.e., that the fact that a witness may have recovered memories in whole or in part through a scientific process goes only to credibility and weight, not admissibility.

## *Per Se Inadmissibility*

Many jurisdictions hold that hypnosis as a general matter fails a *Daubert* (or, in older cases, *Frye*) reliability analysis, and accordingly, witnesses are *per se* barred from testifying to memories recovered during or after hypnosis. For example, the Supreme Court of Alaska (addressing a strikingly similar contention to that made by the Government here) stated:

> The state argues that the *Frye* test is only applicable to expert testimony regarding the reliability of information obtained through a scientific technique and is not meant to apply to the testimony of a previously hypnotized witness. In our view, the state's reading of *Frye* is unduly narrow. The principles and policies supporting the *Frye* test apply equally to hypnotically adduced lay testimony. Further, *Frye* is applicable because lay testimony that is dependent upon hypnosis cannot be logically dissociated from the underlying scientific technique.

*Contreras v. State*, 718 P.2d 129, 134 (Alaska 1986). Further, the court noted, "Nearly every court that has considered the contention that *Frye* does not apply to hypnosis has rejected it." *Id.* at 134 (citations omitted). Then, applying *Frye*, the court held that hypnosis is not sufficiently reliable, rejected a case-by-case approach, and held that testimony related to post-hypnosis memory was inadmissible *per se*. *Id.* at 137-38. That same court later overturned *Contreras*, but only to the extent that it replaced the *Frye* standard with the newer *Daubert* standard while leaving the *per se* exclusion intact. *State v. Coon*, 974 P.2d 386 (Alaska 1999).

12

The Illinois Supreme Court, in adopting the *per se* inadmissibility rule, cited Alaska's decision favorably: "The *Contreras* court . . . appropriately recognized that hypnosis is a technique which elicits scientific evidence and cannot properly be distinguished from other forms of scientific evidence simply because the subject provides the testimony rather than the 'scientist.'" *People v. Zayas*, 131 Ill. 2d 284, 294 (Ill. 1989).

Numerous other jurisdictions, applying similar rationale, have adopted a *per se* rule of inadmissibility (although sometimes with exceptions such as for criminal defendants or for pre- or post-therapy memories that can be shown to be independent of the process). *See State v. Lopez*, 181 Ariz. 8, 10 (Ariz. 1994); *Partin v. State*, 885 S.W.2d 21, 23 (Ark. 1994); *People v. Alcala*, 842 P.2d 1192, 1208 (Cal. 1992); *State v. Atwood*, 479 A.2d 258, 264 (Conn. Super. Ct. 1984); *State v. Davis*, 490 A.2d 601, 605 (Del. Super. Ct. 1985); *Stokes v. State*, 548 So.2d 188, 196 (Fla. 1989); *State v. Moreno*, 709 P.2d 103, 105 (Haw. 1985); *Daniels v. State*, 528 N.E. 2d 775, 777 (Ind. 1988), *vacated on other grounds by Daniels v. Indiana*, 491 U.S. 902 (1989); *State v. Haislip*, 701 P.2d 909, 926 (Kan. 1985); *State v. Culpepper*, 434 So.2d 76, 83 (La. Ct. App. 1982); *State v. Collins*, 464 A.2d 1028, 1044 (Md. 1983); *People v. Reese*, 385 N.W.2d 722, 724 (Mich. Ct. App. 1986); *State v. Patterson*, 331 N.W.2d 500, 504 (Neb. 1983); *State v. Moore*, 902 A.2d 1212, 1227 (N.J. 2006); *State v. Baker*, 451 S.E.2d 574, 590-91 (N.C. 1994); *State v. Munson*, 886 P.2d 999, 1003 (Okla. Crim. App. 1994); *Commonwealth v. Mehmeti*, 500 A.2d 832, 834 (Pa. Super. Ct. 1985); *State v. Tuttle,* 780 P.2d 1203, 1211 (Utah 1989); *Hall v. Commonwealth*, 403 S.E.2d 362, 370 (Va. Ct. App. 1991).

Here, however, is where the differences between hypnosis and EMDR are relevant: these courts arrive at their sweeping conclusion that post-hypnotic testimony is *per se* inadmissible due to their particular concerns with hypnosis. Such concerns may not be so heightened with respect to the reliability of EMDR.[33]

---

[33] *See, e.g. Stalcup v. State*, 311 P.3d 104, 111 (Wyo. 2013) (finding a lower court erred by ruling that expert testimony about EMDR failed *Daubert*'s reliability prong: "To the contrary, the testimony showed that EMDR therapy has been tested through actual use in the field and is accepted as an effective, efficient and reliable technique for treating trauma.").

<u>*Case-by-Case Reliability Determination*</u>

Many other jurisdictions eschew a *per se* rule but require a trial judge, upon appropriate motion, to conduct a hearing to determine the reliability of memories enhanced or recovered through a psychological process before admitting them.  Notably, one of our sister service courts falls into this camp.  *United States v. Harrington*, 18 M.J. 797, 802-03 (A.C.M.R. 1984).  *See also Mersch v. City of Dallas*, 207 F.3d 732, 735 (5th Cir. 2000); *Boykin v. Leapley*, 28 F.3d 788, 794 (8th Cir. 1994); *Beachum v. Tansy*, 903 F.2d 1321, 1326 (10th Cir. 1990); *Chamblee v. State*, 527 So.2d 173, 177 (Ala. Crim. App. 1988); *People v. Romero*, 745 P.2d 1003, 1016 (Colo. 1987); *State v. Joblin*, 689 P.2d 767, 770-71 (Idaho 1984); *State v. Seager*, 341 N.W.2d 420, 431 (Iowa 1983); *Roark v. Commonwealth*, 90 S.W.3d 24, 36 (Ky. 2002); *Rodriguez v. State*, 345 N.W.2d 781, 786 (Minn. Ct. App. 1984); *Alexander v. State*, 610 So.2d 320, 326-27 (Miss. 1992); *State v. Hungerford*, 142 N.H. 110, 133 (N.H. 1997); *State v. Varela*, 817 P.2d 731, 733-34 (N.M. Ct. App. 1991); *People v. Lozado*, 620 N.Y.S.2d 32, 33 (N.Y. App. Div. 1994); *State v. Johnston*, 529 N.E.2d 898, 905 (Ohio 1988); *State v. Medrano,* 127 S.W.3d 781, 783 (Tex. Crim. App. 2004); *State v. Adams*, 418 N.W.2d 618, 624 (S.D. 1988); *State v. Yapp*, 726 P.2d 1003, 1006 (Wash. Ct. App. 1986); *State v. Beard*, 461 S.E.2d 486, 503 (W.Va. 1995); *State v. Armstrong*, 329 N.W.2d 386, 394 (Wis. 1983), *reh'g granted on other grounds,* 700 N.W.2d 98 (Wis. 2005).

These courts, however, differ on the standards for making that determination.

<u>*Procedural Safeguards*</u>

Some assess reliability by requiring procedural safeguards. The Army's *Harrington* case provides an example.  It held that "hypnotically-refreshed testimony satisfies the *Frye* standard and is admissible in a criminal trial if the use of hypnosis in that case was reasonably likely to result in recall comparable in accuracy to normal human memory."  *Harrington,* 18 M.J. at 802 (citation omitted).  Following the influential New Jersey Supreme Court case of *State v. Hurd*, 432 A.2d 86 (N.J. 1981),[34] the Army court went on to place the burden on the proponent of the evidence to demonstrate by clear and convincing evidence

---

[34] Later overturned in favor of a *per se* rule of inadmissibility.  *Moore*, 902 A.2d at 1227.

that the hypnotic procedure complied with the following procedures:

> (1) the interview should be conducted by an independent psychiatrist or psychologist experienced in the use of hypnosis;

> (2) the psychiatrist or psychologist should not be regularly employed by the prosecution or defense;

> (3) any information concerning the case which is revealed to the hypnotist by either party must be recorded in some manner, preferably by videotape;

> (4) a detailed statement from the witness should be obtained prior to the hypnotic session;

> (5) all contact between the hypnotist and the subject must be recorded; and

> (6) only the hypnotist and the subject should be present during any phase of the hypnotic session.

*Harrington*, 18 M.J. at 802-03.

Finally, the court stated that strict compliance with every safeguard was neither a guarantee nor a prerequisite for admissibility. Instead, "[i]f adequate compliance is shown, the military judge must go one step further. He must determine whether the hypnotically-refreshed testimony carries sufficient indicia of reliability by examining the testimony in light of its internal consistency and the facts already known about the alleged incident." *Id.* at 803.

*Totality of the Circumstances*

Other courts conduct their case-by-case admissibility determinations using a totality of the circumstances test. The Supreme Court of New Hampshire adopted this approach in *State v. Hungerford*, 142 N.H. 110 (N.H. 1997), a case relied upon by the military judge in this case and cited by the appellee. There, in two consolidated cases, the court considered the admissibility of memories recovered, notably, through psychotherapeutic techniques other than hypnosis (including "visualization" and "inner child therapy"). *Hungerford*, 142 N.H. at 115. It too found cases addressing hypnosis helpful in its analysis and held "that, when challenged, testimony that

15

relies on memories which previously have been partially or fully repressed must satisfy a pretrial reliability determination." *Id.* at 120. It reasoned that previously repressed memories cannot be separated from a psychotherapeutic process used to recover them and that the phenomenon of recovering memories through such a process is outside the understanding of the ordinary juror. Hence, "[t]he trial court's gatekeeping power on questions of the admissibility of scientific evidence is the most appropriate procedural tool for evaluating this sort of evidence." *Id.* at 119. It adopted a "case-by-case approach, tempered with skepticism," *id.* at 122, and delineated factors for trial courts to consider in assessing the reliability of recovered memories, *id.* at 125-26.

*Borawick v. Shay*, 68 F.3d 597 (2d Cir. 1995) provides another example. There, the U.S. Court of Appeals for the Second Circuit addressed the admissibility of testimony to hypnotically-derived memory. While a civil case, the *Borawick* court freely cited criminal cases and we likewise find the distinction of no moment to our analysis; evidence derived from a psychological process in either a civil or criminal context implicates the same underlying constitutional and evidentiary concerns (if not more acutely so in a criminal case). *Borawick*, indeed, has important similarities to the case at bar as it addresses: (1) a process used in the course of psychotherapy, as opposed to the many cases addressing a process used expressly as an investigative aid; and (2) a situation where the hypnosis was not "specifically directed to the witness's recollections of known events," but rather "where repressed memories of past traumas previously unknown simply emerge following hypnosis." *Id.* at 606. Despite this, the court found a case-by-case reliability determination was required, explaining that while it acknowledged the strength of the arguments that these distinctions lessened concerns about suggestibility and ultimately reliability, "the fact remains that the literature has not yet conclusively demonstrated that hypnosis is a consistently effective means to retrieve repressed memories of traumatic, past experiences accurately." *Id.* at 606-07.

The Second Circuit found the district court was therefore correct to assess reliability on a case-by-case basis, but rejected a procedural safeguards test as being "too rigid and restrictive." *Id.* at 607. It instead adopted the totality of the circumstances approach, offering lower courts a non-exclusive list of factors to consider. The court placed the burden of persuasion on the proponent of the evidence and provided the following guidance: "After consideration of all of

16

the relevant circumstances, the trial court should weigh the factors in favor and against the reliability of the hypnosis procedure in the exercise of its discretion whether to admit the post-hypnotic testimony." *Id.* at 608.

Other courts adopting a totality of circumstances approach include: *Mersch,* 207 F.3d at 732; *Bundy v. Dugger*, 850 F.2d 1402, 1415 (11th Cir. 1988); *McQueen v. Garrison*, 814 F.2d 951 (4th Cir. 1987); *Beck v. Norris*, 801 F.2d 242, 244 (6th Cir. 1986); *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112, 1122-23 (8th Cir. 1985); *Roark v. Commonwealth*, 90 S.W.3d 24 (Ky. 2002); *State v. Johnston*, 529 N.E.2d 898 (Ohio, 1988); *Medrano*, 127 S.W.3d at 783; *State v. Armstrong*, 329 N.W.2d 386 (Wis. 1983), *reh'g granted on other grounds,* 700 N.W.2d 98 (Wis. 2005).

## *Per Se Admissibility*

We are then left with a relatively small number of jurisdictions that adopt what amounts to the Government's position — that whether and in what manner a previously irretrievable memory is recovered is a matter of weight, not admissibility. *See United States v. Awkard*, 597 F.2d 667, 669 (9th Cir. 1979); *State v. Brown*, 337 N.W.2d 138 (N.D. 1983); *State v. Jorgensen*, 492 P.2d 312 (Or. Ct. App. 1971); *State v. Glebock*, 616 S.W.2d 897, 904-05 (Tenn. Crim. App. 1981); *Haselhuhn v. State*, 727 P.2d 280, 284 (Wyo. 1986).

Yet even among those jurisdictions, at least one — the U.S. 9th Circuit — has what amounts to an escape clause to this doctrine. In *Awkard*, in enunciating its rule that the fact of hypnosis is a matter of credibility, not admissibility, it nevertheless noted:

> We have suggested procedures to be followed during hypnosis to ensure that posthypnosis statements are truly the subject's own recollections. . . . Objections to the subject testimony on the ground that such procedures were not followed should be heard by the district judge before trial, or out of the presence of the jury on voir dire of the witness. **If the trial court overrules the objection and permits the subject to testify**, the adverse party may, if it wishes, expose the details of the hypnosis to the jury.

17

*Awkard*, 597 F.2d at 669, n.2 (emphasis added) (citation omitted).

This certainly puts an asterisk on what on its face would appear to be a rule of *per se* admissibility. As the highlighted text emphasizes, a trial judge in the 9th Circuit thus retains discretion, under the right circumstances, to hear and to grant a motion to exclude a witness's testimony based on suggestive procedures used during hypnosis.

A vast majority of jurisdictions thus fall into either the *per se* exclusion or the case-by-case reliability camp — either way finding that a judicial determination of reliability of a psychological process through which memories are derived *is* a precondition to admissibility.

The U.S. Supreme Court has not yet had occasion to speak directly on the matter presented, but in *Rock v. Arkansas*, 483 U.S. 44 (1987), it addressed the constitutionality of Arkansas's *per se* rule of inadmissibility of hypnotically-refreshed testimony as applied to a criminal defendant who wished to provide such testimony in her own defense. This is of course distinguishable from the question at bar: whether a defendant's rights are violated when the *Government* presents testimony to memories recovered or enhanced by a psychological process that has not been shown to be reliable. It nevertheless provides the Supreme Court's analysis of the broader question of admissibility of hypnotically-recovered memories and thus merits close attention.

The Government reads *Rock* as supporting its proposition that the proper mechanism for testing the reliability of KB's memories is not an admissibility determination, but reliance upon the "more traditional means"[35] of cross-examination, defense experts, and cautionary instructions. We read *Rock* quite differently. The Court's issue is not with reliability as a precondition for admissibility, but with a *per se* rule precluding a defendant from testifying to her post-hypnotic memories without any opportunity to demonstrate reliability. The Arkansas rule did not allow a case-by-case reliability determination, but instead prohibited such testimony "without regard to the reasons for it, the circumstances under which it took place, or any independent verification of the information it produced." *Rock*, 483 U.S. at 56. This left "a trial judge no discretion to admit this testimony, *even if the judge is*

---

[35] *Rock*, 483 U.S. at 60.

*persuaded of its reliability* by testimony at a pretrial hearing." *Id.* at 56, n.12 (emphasis added) (citation omitted).

The Court acknowledged that hypnosis "may lead to the introduction of inaccurate memories," *id.* at 59, but noted that "[t]he inaccuracies the process introduces can be reduced, although perhaps not eliminated, by the use of procedural safeguards[,]" *id.* at 60. "Such guidelines," it continued, "do not guarantee the accuracy of the testimony, because they cannot control the subject's own motivations or any tendency to confabulate, but they do provide a means of controlling overt suggestions." *Id.* at 60-61. It is here (to put the Government's reference to "traditional means" into context) that the Court states, "[t]he more traditional means of assessing accuracy of testimony *also* remain applicable in the case of a previously hypnotized defendant," *id.* at 61 (emphasis added), such as corroborating evidence, cross-examination, expert testimony, and jury instructions.

The court's conclusion is most telling:

> A State's *legitimate interest in barring unreliable evidence* does not extend to *per se* exclusions that may be reliable in an individual case. Wholesale inadmissibility of a defendant's testimony is an arbitrary restriction on the right to testify in the absence of clear evidence by the State repudiating the validity of all posthypnosis recollections. The State would be well within its powers if it established guidelines to aid trial courts in the evaluation of posthypnosis testimony and it may be able to show that testimony *in a particular case is so unreliable that exclusion is justified*. But it has not shown that hypnotically enhanced testimony is always so untrustworthy and so immune to the traditional means of evaluating credibility that it should disable a defendant from presenting her version of the events for which she is on trial.

*Id.* at 61 (emphasis added).

Significantly, the four-justice dissent noted "the inherently unreliable nature"[36] of hypnotically-induced testimony and that they would have affirmed the Arkansas Supreme Court's

---

[36] *Id.* at 62 (Rehnquist, C.J., dissenting).

determination that such testimony was always inadmissible.  All nine justices thus acknowledge the relevance of reliability to a determination of admissibility of hypnotically-derived testimony and differ only on whether *per se* inadmissibility as applied to a criminal defendant was too blunt an instrument to pass constitutional muster.  Far from supporting the Government's position, *Rock* provides compelling support for the proposition that when it comes to admissibility of memories recovered from a psychological process, reliability matters.[37]

## *Adopting a Totality of Circumstances Approach*

Having carefully considered the matter, we hold that memory recovered by means of a formal psychological process is the product of a scientific process and therefore subject to a baseline reliability determination as a precondition to admissibility.  We are mindful that *Daubert*, *Houser*, and MIL. R. EVID. 702 apply expressly to expert witness testimony and that no specific rule of evidence dictates this.  Nevertheless, law and logic persuade us that the Government may not avoid a military judge's scrutiny of a psychological process by which a memory is recovered by having a lay witness testify to the result of that process.  Undergirding constitutional principles reaching back to *Frye* and extant today apply with equal force to lay testimony obtained through, and potentially polluted by, a scientific process.  These principles include an accused's right to a fundamentally fair trial under the Due Process Clause of the 5th Amendment and, under certain circumstances, his 6th Amendment right of confrontation.[38]

In determining whether there is adequate reliability to warrant admissibility, we adopt the totality of the circumstances approach, largely tracking the 2nd Circuit's approach in *Borawick*.  Therefore, testimony dependent upon

---

[37] The majority could have simplified its analysis considerably had it believed that a witness's prior hypnosis is strictly a matter of weight, not admissibility.  It did not fashion a rule of *per se* admissibility that the Government seeks here even for a criminal defendant.

[38] *See, e.g., McQueen*, 814 F.2d at 958, n.15 (citing both 5th and 6th Amendment concerns; "where a witness' recall concerning all or most of the details of a crime has been hypnotically enhanced, possibly injected into the trial is a question of whether the defendant's due process rights were violated because the use of hypnotically enhanced testimony may have resulted in a fundamentally unfair trial."); *Wicker v. McCotter*, 783 F.2d 487, 493 (5th Cir. 1986)("Under some circumstances, hypnosis may render a witness so positive, so certain, that effective cross-examination is impossible." (Footnote omitted)).

memory that has been enhanced or recovered through EMDR is admissible when, based on a totality of the circumstances, it is reasonably likely that the memories are at least as reliable as ordinary human memory. Once properly raised, the proponent of the evidence bears the burden of persuasion by a preponderance of the evidence. In weighing the circumstances, the military judge should consider the following non-exclusive factors:

(1) The qualifications and experience of the person administering the procedure;

(2) The purpose of the procedure, whether used as a criminal investigative aid, intended to recover memories, or a by-product of a therapeutic procedure. There is a greater danger of suggestibility in the former two, while there is a lesser danger in the last;

(3) The circumstances surrounding application of the psychological procedure and the recovery of memories, including whether the subject received any suggestions, implicit or explicit, from the expert or others and whether the expert knowingly or unknowingly affirmed in the subject's mind the factual accuracy of the recovered memories;

(4) The presence or absence and quality of a permanent record of the EMDR sessions to assist the court in ascertaining whether suggestive procedures were used and the results of the procedure;

(5) Expert evidence offered by the parties as to the reliability of the procedures used in the case; and,

(6) Whether independent corroborating evidence exists to support the reliability of the recovered memories.

This test is intended to be flexible. It is the military judge's bottom-line duty, as gatekeeper, to ensure that such evidence is sufficiently reliable to pass constitutional muster.

## II. Application to Present Case

The military judge, applying the undergirding principles of *Daubert*, conducted a hearing to assess the reliability of KB's EMDR-derived testimony based on a totality of the circumstances. This, as we have held, was the correct legal framework. We

21

move, then, to the military judge's application of that framework to the facts of this case —— at this point according him greater deference and only reversing if his predicate findings of fact are not supported by the evidence or his application of the correct legal principles is clearly erroneous. *Ellis*, 68 M.J. at 344.

The military judge's findings of fact upon which he predicated his ruling are supported by the record. To assess his conclusions, we apply the military judge's findings of fact to the factors we have laid out:

(1) Dr. Bhattacharya is reasonably qualified and experienced in the therapeutic use of EMDR. She conceded, however, that her background and focus were not forensic: she had no training in forensic psychology and no familiarity with standards or procedures that would be applied in a forensic setting.

(2) The purpose of the procedure in this case was therapeutic, not investigative, which as we have stated typically militates toward less danger of suggestibility. Yet here, the purpose of EMDR was not to assist a subject in processing some previously-known traumatic event, a purpose to which EMDR is well suited. Instead, it was to try to determine why KB experienced general discomfort with the appellee when she had no present existing memory of any abuse by him. Given that the therapist was aware that the appellee had allegedly sexually abused KB as a young child as well as other children, the purpose of conducting EMDR on KB to determine the source of her discomfort with her father becomes of greater concern and the danger of suggestibility increases.

(3) The conditions under which Dr. Bhattacharya conducted her psychotherapy were severely suggestive. The military judge summed it up neatly:

In the case at bar we have the following:

- a troubled teenager who has long been the subject of repeated suggestive questioning by her mother about suspected abuse;

22

- who had consistently denied such suggestions of abuse to both her mother and her step-mother for years, and who oddly now fails to recall any such questioning altogether;

- who had no conscious memory or recall of any sexual abuse prior to the EMDR;

- who sought out a psychologist because of her advertised ability to treat those experiencing problems with the paranormal;

- who experienced shared flashes of seeing ghosts with her psychologist;

- who for the very first time recalled a 6 to 8 year old memory of sexual abuse when she was herself between 6 to 8 years of age while undergoing EMDR, and in which she believes her psychologist "shared" her memory; and,

- who left treatment that day only to be repeatedly interrogated by her mother until she finally told her mother enough to get her to stop asking questions;

- who was actively looking for a means of not having to spend any further time with her father — an end result that she successfully achieved with this allegation;[39] coupled with

- A psychologist who eventually — after lengthy cross-examination — admitted that she was aware of the mother's suspicions of sexual abuse, and even had a copy of the NCIS investigation prior to the EMDR treatment; and,

- The testimony of two expert witnesses — Ms. Gilman (for the government) and Dr. Younggren (for the defense) who both testified that there were major

---

[39] The relevance of this finding of fact is not whether there may have been a motive to fabricate.  The analysis at this stage is only whether her memory is at least as reliable as ordinary memory, which is always subject to such considerations; an alleged motive to fabricate would indeed be a matter for a fact-finder to assess.  Still, an indication that a subject may have had a predisposition to believing an allegation may feed into the larger analysis of a subject's vulnerability to suggestiveness.

23

violations of proper EMDR and psychotherapy treatment in this case that called into serious doubt the accuracy of any resulting memory.[40]

(4)  There were no video or voice recordings and only sketchy, incomplete notes available to the court as permanent records of Dr. Bhattacharya's EMDR sessions to assist in determining whether, and to what extent, suggestive procedures were used.

(5)  Both experts, Government and defense, raised significant concerns with the therapist's application of psychotherapy in this case, calling the reliability of resulting recovered memories into serious question.

(6)  There is scant corroborating evidence to support the reliability of the recovered memories.  We agree with the military judge that KB's ability to recall details of the appellee's house or vehicle at the time of the alleged abuse does not indicate the accuracy of the memory of abuse.  Further, the 20-year-old allegations of abuse of two other children lacks the factual similarity necessary to constitute sufficient corroborating evidence as an indicator of accuracy.

Given the totality of the circumstances, the military judge did not abuse his discretion in finding the evidence unreliable and therefore granting the motion to suppress KB's testimony.

## Conclusion

The Government's appeal is DENIED.  The military judge's ruling is affirmed and the record of trial is returned to the Judge Advocate General for remand to the convening authority and delivery to the military judge for further proceedings.

Senior Judge MCFARLANE and Judge HOLIFIELD concur.

For the Court

R.H. TROIDL
Clerk of Court

---

[40] AE XXXVI at 11.