# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55942-1-II |
| | (consolidated w/ No. 57102-1-II) |
| Respondent, | |
| v. | |
| RANDY LOUIS DONALDSON, | UNPUBLISHED OPINION |
| Appellant. | |
| In the Matter of the Personal Restraint of: | |
| RANDY LOUIS DONALDSON, | |
| Petitioner. | |

GLASGOW, C.J. — Daquan Foster got into a fistfight with Marshall Wilson outside of a bar in Tacoma. Wilson pulled a gun and shot at Foster. Randy Donaldson ran towards the fight and also shot at Foster. Foster was killed and his wife, Olivia Brown, was shot in the hand.

Brown described Donaldson to police several times immediately after the shooting, each time describing a light-skinned Black man who had shoulder-length dreadlocks pulled back into a ponytail, had a gold grille in his mouth, and wore a black hoodie. Later that morning, friends showed Brown a Facebook video taken the night of the shooting that included Donaldson.

A few days later, Brown identified Donaldson to police as the person in the Facebook video who later shot her husband. That same day, police showed Brown photo montages, including one

where Donaldson was the only person with dreadlocks. Brown initially could not identify any shooter in the montages, but she called police the next day and identified Donaldson as the shooter.

The State charged Donaldson with second degree murder of Foster, first degree assault of Brown, and second degree assault of another witness, all with firearm sentencing enhancements. After two mistrials, a jury convicted Donaldson.

Donaldson appealed and filed a timely personal restraint petition (PRP) that we consolidated. He argues the trial court erred by admitting Brown's pretrial and in court identifications of him because the photo montage procedure was impermissibly suggestive and Brown's identifications were not reliable. His PRP introduces research asserting that a trauma therapy Brown underwent after the shooting may have implanted false memories. Next, Donaldson contends that the trial court erred by admitting portions of music videos Donaldson appeared in. He also asserts that the prosecutor committed misconduct in closing arguments and that trial counsel was ineffective for failing to object to the misconduct. And he insists that cumulative errors require a new trial. Finally, Donaldson filed a statement of additional grounds for review (SAG).

Although the photo montage procedure was impermissibly suggestive, Brown's identification was reliable under the totality of the circumstances. We reject Donaldson's remaining arguments, affirm his convictions, and deny his PRP.

FACTS[1]

I. BACKGROUND

A.    Shooting

Donaldson and Wilson were hip hop artists who appeared in several of each other's music videos. They went to a Tacoma bar together one night in 2017. Several members of their group attracted attention by throwing money in the air inside of the bar.

That night, Foster, Brown, and a group of friends went to the same bar to celebrate Brown passing a military aptitude test. Some of Brown and Foster's friends picked up money from the ground that Donaldson and Wilson's group had thrown in the air.

Foster and Brown's group stayed until the bar closed, then left the building. In the bar's parking lot, Foster and Wilson got into an altercation and exchanged punches. Wilson pulled a gun and began shooting at Foster. Another man, identified at trial as Donaldson, ran up and also shot at Foster.

Foster was shot seven times in the torso, including one bullet that penetrated his lung and heart. Brown was shot in the hand. Foster died from his wounds.

Police recovered thirteen 9 millimeter and four .40 caliber casings from the bar parking lot. The 9 millimeter casings were all fired from one gun and the .40 caliber casings were all fired from a single other gun. The firing pin impression on the 9 millimeter casings was most often seen on bullets fired from Glock guns. A single 9 millimeter bullet, which was not the bullet that killed

---

[1] The State improperly cites to argument rather than evidence to support factual statements in its briefing. For example, the State asserts that Donaldson "shot 13 rounds from a 9mm handgun," citing to the prosecutor's opening statements and argument during motions in limine. Br. of Resp't at 5. Donaldson correctly notes that opening, closing, and other attorney arguments are not evidence.

Foster, was recovered from Foster's body; all other bullets had exited his body. Police could not determine whether a 9 millimeter or .40 caliber bullet was the one that killed him. No firearms were ever recovered in connection with the shooting.

B.     Initial Interviews

At the scene around 1:45 a.m., Brown described a single shooter to an officer and said the shooter was not the person who had been fighting with her husband. She described "a light-skinned male with dreadlocks pulled back into a ponytail with a grill in his mouth wearing a black hoodie." 12 Verbatim Rep. of Proc. (VRP) at 1217. A "different person" had been fighting with Foster before the shooting. 12 (VRP). at 1218.

Brown was then taken to the hospital for her hand injury. Shortly after arriving at the hospital around 2:20 a.m., she spoke to a patrol officer. This time, Brown described two shooters to the officer. The first was a "possibly Hispanic male" who was right next to Foster. 9 VRP at 862. The second, "who ran up behind later and was shooting," was "a light complexion, high yellow, [B]lack male [who was] five-foot nine to six-foot in height; approximately 170 pounds; late 20s in age; [with] shoulder-length dreadlocks pulled back into a ponytail; gold grille in his mouth; and wearing a black hoodie." 9 VRP at 863.

Detectives then interviewed Brown early in her stay at the hospital, around 3:45 a.m. She described only one shooter to the detectives: the man who ran up to help the person who was fighting with her husband. Brown said she saw the shooter earlier in the night "in the club throwing singles in the air." Ex. 232, at 6. She said the shooter was a "[l]ight skinned [B]lack" man. *Id.* "He had dreads . . . in a ponytail. He had a black . . . hoodie on." *Id.* She said the shooter was approximately five feet eight inches tall, roughly 170 pounds, and wearing a grill. Brown described

the shooter's handgun as "short" but "with a long clip." Ex. 232, at 7. She thought the clip was spray-painted white but was not certain about the color of the gun's body.

Police interviewed other members of Foster and Brown's group at the police station. One friend who was close to the shooting, Wyatt Percell, described a single shooter who was a Latino male wearing a white shirt, a description that matched Wilson. Another friend described a single shooter who was a "Black male in his mid to late 20s, approximately five-foot-eight inches tall, 160 pounds," with a "boney, narrow face, [and] exposed teeth." 13 VRP at 1315. She said the shooter had "a nappy, but thin beard" and was wearing a black T-shirt. *Id.* She also said that the shooter had "[t]wo French-braided dreads." 13 VRP. at 1317; *see also* 10 VRP at 996 (trial testimony where the same witness described the shooter as a light-skinned Black man with dreadlocks "braided to the back," thin facial hair, and a black hoodie).

C.     Facebook Video

After their interviews at the police station, a group of Brown's friends went to meet her at the hospital between the hours of 4:00 a.m. and 6:00 a.m. While the group discussed the shooting, one friend thought she had recognized a member of the group who was throwing money in the bar and began searching for that person on Facebook. She found the person's Facebook profile, which contained a video, recorded that night, of the group that was throwing money inside the bar.

The friends showed Brown the Facebook video. Brown, Percell, and another witness who had described the shooter at the police station all agreed that the shooter, who would later be identified as Donaldson, appeared in the video. The friends then alerted police, who contacted Facebook with a warrant.

D.  Photo Montage

The shooting occurred early in the morning on October 29, 2017. On the afternoon of October 31, three detectives visited Brown to administer two photo montages, one for each suspected shooter. Before they administered the montages, Brown told them she had seen the Facebook video.

All of the montage photos were from driver's licenses. Donaldson's image was in one of the montages along with five other photos of Black men. Donaldson's photo was the only one in his montage of a person with dreadlocks; the other five men had braided hair The photo montage can be viewed here: https://perma.cc/JX4Q-FEMZ. Donaldson was also the only person in his montage wearing red clothing. Brown could not identify anyone from either montage. But she lingered on Donaldson's photo in his montage, commenting, "'He had dreads,'" and "'[t]he guy in the red looked like him, but he had lighter skin.'" 15 VRP at 1792, 1794.

After the detectives left that day, Brown called one of the detectives and sent screenshots from the Facebook video, identifying the shooter in the video. On November 1, 2017, Brown called another detective and asked to see the photo montage with Donaldson again, and the detective refused. Brown then said, "'The guy in the dreads with the red is the guy,'" referring to the image of Donaldson in the montage. 15 VRP at 1679; Ex. 29.

E.  Donaldson's Arrest

Police arrested Wilson and Donaldson in early November 2017. No firearms were recovered during either arrest. One officer asked Donaldson his name. Donaldson responded, "'You've got your prize. Let's go.'" 13 VRP at 1415. Without further prompting from the officer, he then said, "'Okay. I'm 30. I've done everything I wanted to do.'" *Id.*

6

The State charged Donaldson with second degree murder and second degree felony murder of Foster, first degree assault of Brown, and second degree assault of their friend Percell.[2] All of these charges had firearm sentencing enhancements.

F.      First and Second Trials

The State tried Wilson and Donaldson together in 2019. The jury convicted Wilson but deadlocked on all charges against Donaldson.[3] The trial court declared a mistrial.

Donaldson's second trial began in February 2020. After losing several jurors due to complications from the COVID-19 pandemic, Donaldson declined to proceed with 11 jurors and the trial court declared another mistrial.

II. THIRD TRIAL

A.      Preliminary Proceedings

Before Donaldson's third trial, the State moved to admit the statements Donaldson made when he was arrested under CrR 3.5. The trial court found that Donaldson "made a series of statements despite not being asked any questions" except for his name. Clerk's Papers (CP) at 739 (Finding of Fact (FF) 9). It found that Donaldson "stated, 'You got your prize, let's go!' and 'I'm thirty, I've done everything I wanted to do.'" *Id.* (FF 10).The trial court concluded that the statements Donaldson made during his arrest were admissible because "they were made voluntarily and not in response to questioning or interrogation." CP at 741 (Conclusion of Law 2).

---

[2] The assaults on Brown and Percell were the underlying felonies for the felony murder charge. The State also charged Donaldson with unlawful possession of a firearm. Donaldson later waived his right to a jury trial regarding this charge, allowing the judge to decide it.

[3] After the jury deadlocked in the first trial, the State dismissed the unlawful possession of a firearm charge against Donaldson for tactical reasons before the trial court issued its ruling.

Donaldson initially moved to exclude any rap music videos or still photos from those videos as irrelevant under ER 403 and as ER 404(b) evidence of prior bad acts. The trial court indicated that the music videos and still photos from them would likely be admissible for specific purposes, such as establishing a relationship between Wilson and Donaldson, but it did not make a final ruling.

B.      Evidence Presented at Trial

1.      Testimony about the photo montage

At trial, Brown testified that she watched Foster and Wilson get in a fistfight and that Foster knocked Wilson to the ground. Wilson got up and was reaching for a gun when a second man "came out of nowhere and just start[ed] shooting [Foster], and then they both started shooting [Foster]." 11 VRP at 1081-82. She then identified Donaldson in the courtroom as the shooter who ran up on the fight. Defense counsel did not object to Brown's in-court identification of Donaldson as the shooter. Brown also explained that she saw Wilson and Donaldson earlier that night with the group throwing money inside the bar.

When the State moved to admit the photo montage that included Donaldson, defense counsel objected, arguing that the montage was inadmissible under ER 403. Defense counsel asserted that Brown could not initially identify the shooter from the montage, so admitting the evidence would be "suggestive," confusing, and misleading. 12 VRP at 1178-80. The trial court overruled the objection and admitted the photo montage and Brown's testimony about her identification of Donaldson from the montage. One of the detectives who administered the montage testified that there is "often a problem with montages if you use driver's license photos" because the subject's skin tone can appear different than in real life. 15 VRP at 1748.

On cross-examination, defense counsel elicited testimony that Brown saw the Facebook video before she identified Donaldson from the photo montage. And while cross-examining another detective who administered the photo montage, defense counsel questioned the value of Brown's identification, asking if the montage was "unduly suggestive" because it was "obvious" that Donaldson was the only person in the montage with dreadlocks. 17 VRP at 2112-13.

2.      Testimony about EMDR therapy

During trial, Brown addressed the fact that she had been inconsistent in remembering whether or not Wilson fired a gun. She said she remembered Wilson shooting after undergoing eye movement desensitization and reprocessing (EMDR) therapy in the months following the shooting.

EMDR therapy "requires the clinician to move a finger back and forth across the patient's field of vision . . . while the patient considers a selected unsettling image related to a traumatic experience." Captain Evan R. Seamone, *Attorneys as First-Responders: Recognizing the Destructive Nature of Posttraumatic Stress Disorder on the Combat Veteran's Legal Decision-Making Process*, 202 MIL. L. REV. 144, 175-76 (2009). The therapy reduces the emotional response of a memory so the recollection becomes "'a flashbulb memory, a picture with . . . just a feeling of sadness and a sense of loss,'" instead of a trigger for posttraumatic stress. *Id*. at 176 (quoting ASHELY R. HART II, AN OPERATOR'S MANUAL FOR COMBAT PTSD: ESSAYS FOR COPING 31 (2000)).

Brown testified that the therapy "[brought her] back to the scene of everything that happened" and allowed her to "remember more," as well as healing the traumatized part of her brain. 12 VRP at 1189-90.

9

At a break, defense counsel requested a one-month continuance to research EMDR therapy, arguing that the State had committed a discovery violation by not telling counsel that Brown "was in memory improvement therapy . . . designed to recall details of the event." 12 VRP at 1193. The State responded that EMDR was intended as a trauma therapy, that no one had ever asked Brown if she had gone through trauma therapy, and that "[i]t is not a discovery violation simply because no one has ever asked." 12 VRP at 1194. The trial court stated, "I don't know what the significance of any of this is," but reasoned that the therapy "was not necessarily supposed to be a memory enhancement" as much as "a way to cope with trauma." 12 VRP at 1196. And it concluded that there was not "any discovery violation or misconduct from the prosecutor since it appears that . . . they were as surprised by this as anybody." *Id.* The trial court denied the motion for a continuance. Defense counsel then requested a recess for the remainder of the morning "to study up" before continuing cross-examination in the afternoon. *Id*. The trial court also denied that request.

On cross-examination, Brown testified that she did not know what the acronym EMDR stood for, how the therapy worked, or whether the therapy was intended to help with "trauma coping as opposed to recreating memories." 12 VRP at 1199.

### 3. Other identifications of shooters

Surveillance videos of the shooting admitted at trial showed at least seven muzzle flashes associated with two different people. The State's video expert testified that because the surveillance cameras recorded only 30 frames per second, additional muzzle flashes could have occurred without being captured on the video. Identifying the shooters from the surveillance video was difficult due to the poor lighting, low resolution of the video, and distance of the camera from the shooting.

One of the witnesses who had previously described Donaldson to police testified about what she saw during the shooting. The witness said that when the shooting was happening, she was close enough to reach out and touch the one shooter she saw. She explained that after the shooting, when she was at the hospital, she watched the Facebook video and recognized Donaldson as the shooter. She then identified Donaldson as the shooter in the courtroom.

The trial court also admitted a transcript of the testimony of another of Brown's friends, who testified in the first trial but was found to be unavailable for the third.[4] In the first trial, the friend said that before the shooting, she saw Foster get into a fight with a man who "looked Hispanic," was "extremely light skinned," and was "definitely shorter than Foster." CP at 785. She described seeing only one shooter but hearing a pattern of gunfire that made her "assume that there was more than one person shooting." CP at 788. The shooter she saw was a medium-skinned Black man with dreadlocks, but she could not recall the length of the dreadlocks or if they were tied back.

Percell, the victim of the second degree assault charge, also testified. Although other witnesses testified that he had previously identified Donaldson as a shooter, Percell, who suffered posttraumatic stress after the shooting, could not identify the shooter in the courtroom and did not recall identifying Donaldson as a shooter. *See* 16 VRP at 1942-48 (testimony that Percell identified Donaldson as the shooter from the Facebook video around the time of the first trial); 22 VRP at 2822 (testimony that Percell identified Donaldson as the shooter from the Facebook video at the hospital).

---

[4] The State bought this witnesses a plane ticket, but she refused to get on the plane and stopped responding to messages from the prosecutor. The trial court found that she was unavailable under ER 804 and that defense counsel had adequate opportunity to develop her testimony through cross-examination in the first trial. Thus, her testimony from the prior trial was read to the jury.

Defense witnesses testified that they saw Wilson shoot, but not Donaldson. One witness testified that Donaldson was the only person in his group in the bar with dreadlocks. One witness identified a "light-skinned" shooter and said Donaldson was not near the shooting. 14 VRP at 1495. Another defense witness who arrived at the bar with Donaldson and Wilson testified that she saw Wilson fire a gun before she turned and ran from the scene. She initially testified that Donaldson did not have anything to do with the shooting. The State then impeached her with her prior testimony that she saw Donaldson "r[u]n towards the tussle" of Wilson and Foster immediately before the shooting. 16 VRP at 1878.

4.      Music videos

The State moved to admit several still images from a music video Donaldson appeared in. The video was posted online three days before the shooting. The images showed Donaldson holding what appeared to be a Glock handgun with an extended magazine, the kind of gun and magazine used in the shooting. The video had a disclaimer at the end stating that all of the guns in the video were props. The trial court ruled that the still images of Donaldson were relevant to show that he had access to that kind of gun.

After the trial court's ruling, Donaldson moved to admit the entire music video without sound, including the disclaimer, under the rule of completeness. The trial court ruled that most of the video was admissible, but excluded the disclaimer as hearsay. It does not appear from our record that the video was ever played for the jury.

The State later offered and the trial court admitted several more still images from music videos Donaldson appeared in over defense counsel's ER 403 and 404(b) objections. Two stills showed the outfit Donaldson wore for a video and a third showed someone with the same clothing

holding a gun with an extended magazine. Another image showed someone taking the magazine out of a gun. Other images showed the car Donaldson was alleged to have left the crime scene in, Donaldson wearing a gold grille, and Donaldson and Wilson standing next to each other or appearing in each other's videos.

The State's firearm expert testified that the 9 millimeter casings at the crime scene were likely fired from a Glock. The State then showed the expert witness the music video images of the gun. The expert explained that Donaldson was holding something "visually consistent [with] a Glock firearm" in the images but could not identify the caliber or "say with any certainty" whether the gun or ammunition in the images was real. 18 VRP at 2184.

C.      Jury Instructions and Closing Arguments

The jury instructions provided the law of accomplice liability, explaining that a person is an accomplice to a crime "if, with knowledge that it will promote or facilitate the commission of the crime," they encourage or ask another person to commit the crime or "aid[] or agree[] to aid another person in planning or committing the crime." CP at 844. The instructions stated that "'aid'" includes "words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by [their] presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown." *Id.*

In closing arguments, the prosecutor summarized the concept of accomplice liability. The prosecutor explained, "[W]hen you knowingly assist someone in the commission of a crime, you are responsible, not only for your actions, but you're responsible legally for the actions of the person you are assisting." 23 VRP at 2906-07. "And so . . . when the defendant runs up to provide aid to Marshall Wilson, the defendant is not only responsible for his gun and his bullets; he's

responsible for Marshall Wilson's gun and Marshall Wilson's bullets as well." 23 VRP at 2907. Defense counsel did not object to this explanation.

Later, the prosecutor applied the principle to the facts of the case, explaining that although one of the bullets removed from Foster was a 9 millimeter, the caliber of the bullet that killed Foster by piercing his lung and heart was unknown: "This gets back to the idea of accomplice liability. Regardless of whose bullet it was that killed [Foster], you are responsible, not only for your bullets, but [for] those of your accomplices." 23 VRP at 2942. Again, defense counsel did not object.

The prosecutor also summarized the evidence in the case, including the statements Donaldson made when arrested:

> He is arrested, and this isn't some small-time arrest. . . . This is a massive— officer, SWAT included [operation], that are arresting the defendant, taking him to Tacoma patrol cars with Tacoma officers in uniform for a murder that happened eight days earlier. He knows exactly what this is about. And what is his response?
> His response is not something like "you've got the wrong guy" or "what's this about" or "I didn't do this." His response is nothing like you would expect from someone who didn't do it. His response is one of absolute defiance and just indifference, talking about how the officers got their prize. Even more importantly, "It's okay. I did everything I wanted to do. I'm 30. I did everything I wanted to do in my life." That's his statement. You are being arrested for murder. You are being arrested for gunning down a 22-year-old, and your statement is "It's okay. I did everything I wanted to do in my life anyway." It's really a callous statement because [Foster] didn't get to do everything in his life that he wants to do. More than that, it gives a window into his mindset. These are not the words of someone who didn't do it.

23 VRP at 2938-39. Defense counsel did not object to these comments.

In defense closing arguments, counsel attacked Brown's credibility while emphasizing the credibility of witnesses who described seeing only Wilson fire a gun. In rebuttal, the State

commented that counsel "didn't have one way of explaining away his client's statements when he was arrested." 23 VRP at 2976.

D.     Verdict and Later Proceedings

The jury convicted Donaldson of all charges and found that he was armed with a firearm during all the offenses.

At sentencing, the trial court ruled that the second degree felony murder conviction merged with the second degree murder conviction. The trial court imposed a sentence at the high end of the standard sentencing range for the second degree murder and the low end of the standard sentencing range for the first degree assault.[5] After the firearm sentencing enhancements, the total sentence imposed was 514 months.

Donaldson appealed and filed a CrR 7.8 motion that was transferred to this court as a timely PRP, which we consolidated. The PRP includes a declaration from Dr. Henry Otgaar explaining that EMDR can amplify the formation of false memories. But Otgaar also admits that he "do[es] not have enough information" to form an opinion on whether "Brown's receipt of EMDR actually did cause the creation of any false memories such that her testimony regarding her husband's death was inaccurate." PRP, Decl. of Otgaar at 9.

---

[5] Because the second degree murder and first degree assault were both serious violent offenses, their sentences had to run consecutively, while the second degree assault charge could run concurrently.

15

ANALYSIS

I. EVIDENTIARY RULINGS

A.     Pretrial Identification

Donaldson argues that Brown's pretrial identification of him in the photo montage was obtained through an impermissibly suggestive procedure that was not reliable under the totality of the circumstances. The State responds that Donaldson failed to preserve this claim for review because he did not move to suppress the results of the photo montage below. And it argues that there is not a sufficient record to determine whether the identification procedure was impermissibly suggestive. We agree with Donaldson that there is a sufficient record for us to review his challenge to Brown's identifications, and we agree that the photo montage was impermissibly suggestive, but we hold that Brown's identifications were nevertheless reliable under the totality of the circumstances.

We may review an issue raised for the first time on appeal if it suggests a manifest error affecting a constitutional right. RAP 2.5(a)(3). Donaldson objected to the admission of the photo montage below, although he did not challenge the identification's suggestibility and lack of reliability. But defense counsel cross-examined Brown about the reliability of her identification, and once the montage was admitted, Donaldson cross-examined the lead detective about the suggestibility of the montage, developing a record relevant to these issues. And the due process clause of the Fourteenth Amendment to the United States Constitution requires the exclusion of identifications that were "obtained by an unnecessarily suggestive police procedure" and that lack "reliability under the totality of circumstances." *State v. Derri*, 199 Wn.2d 658, 673, 511 P.3d 1267

(2022). Because Donaldson raises an issue that implicates a constitutional right, we evaluate the merits to determine whether any constitutional error was manifest.

We first examine whether the "police-administered identification procedure was unnecessarily suggestive." *Id.* at 674. If the procedure was suggestive, we then "must consider whether, under the totality of the circumstances, the unnecessarily suggestive procedure created 'a very substantial likelihood of irreparable misidentification.'" *Id.* (internal quotation marks omitted) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)).

      1.      <u>Suggestiveness of identification procedure</u>

Donaldson first argues that the photo montage procedure was impermissibly suggestive. He contends that his photo was the only one in the montage that matched Brown's earlier descriptions to police of a Black man with dreadlocks. And he asserts that, because the detectives administering the montage knew Donaldson was a suspect, the lack of a double-blind procedure further impacted the montage's suggestibility. We agree that having only one person in the montage with a distinctive hairstyle that matched the witness's earlier descriptions rendered the montage impermissibly suggestive.

A photo montage is impermissibly suggestive if it "directs undue attention to a particular photo." *State v. Eacret*, 94 Wn. App. 282, 283, 971 P.2d 109 (1999). Generally, a photo montage will be impermissibly suggestive "when the defendant is the only possible choice given the witness's earlier description." *State v. Ramires*, 109 Wn. App. 749, 761, 37 P.3d 343 (2002). For example, courts have found montages impermissibly suggestive when witnesses described distinctive characteristics and the defendants were the only people in the montages with those

characteristics. *Derri*, 199 Wn.2d at 678. *See State v. Kinard*, 109 Wn. App. 428, 431, 433, 36 P.3d 573 (2001) (defendant only person in photo montage with tooth gap); *State v. Burrell,* 28 Wn. App. 606, 611, 625 P.2d 726 (1981) (defendant only person in photo montage with "frizzy Afro" hairstyle).

Here, Donaldson was the "only possible choice" in the photo montage after Brown's preliminary descriptions to police of a light-skinned Black man with shoulder-length dreadlocks. *Ramires*, 109 Wn. App. at 761. Other witnesses described a shooter with braids, but Brown only ever described dreadlocks to police. And the lack of a double-blind procedure was another factor weighing in favor of suggestiveness.[6] We hold that the montage was impermissibly suggestive. We must then examine the reliability of Brown's identification under the totality of the circumstances. *Derri*, 199 Wn.2d at 673.

2. Reliability of identification

Donaldson argues the identification was unreliable because the shooting happened quickly and at night, Brown was injured during the shooting, and she initially did not identify the shooter from the montage. He also reasons that Brown received cowitness suggestion when her friends showed Brown the Facebook video of Donaldson at the bar that same night. And he asserts that the EMDR therapy Brown underwent before trial potentially created false memories. We disagree.

The State argues that "Donaldson did not develop [a clear record on] whether there was any cowitness suggestion" from Brown's viewing of the Facebook video, so "[t]he lack of a record

---

[6] The lack of a double-blind montage without more will not necessarily render a procedure suggestive. *See Derri*, 199 Wn.2d at 685.

prevents review." Br. of Resp't at 53-54. But counsel cross-examined the detectives and Brown about the reliability of her identification, developing a sufficient record.[7]

Courts use several factors in assessing the reliability of an identification. *Neil v. Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972). We consider the witness's opportunity to view the defendant at the time of the crime, the witness's degree of attention, the accuracy of the witness's descriptions, the level of certainty demonstrated at the procedure, and the length of time between the crime and the identification. *Derri*, 199 Wn.2d at 674. We also consider other variables that can affect reliability, such as cowitness suggestion. *Id*. at 689. Where the identification's "'aspects of reliability' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Id*. at 674-75 (quoting *Brathwaite*, 432 U.S. at 116).

In *Derri*, the Washington Supreme Court held that three bank employee witnesses' identifications of a robber were reliable despite a suggestive police procedure tainted by "the failure to employ a double-blind procedure, multiple exposures to the same suspect, and use of a single suspect showup." *Id*. at 685. First, two of the three witnesses interacted with the robber several weeks before the crime and told police they recognized him from that interaction. *Id*. at 686. Despite the stress of witnessing the robbery, "the witnesses were all able to provide a detailed

---

[7] To establish Brown's prior opportunity to view Donaldson, the State asserts, without citation to the record, that "Brown and [another witness] . . . contacted Donaldson in the night club in a moment of levity. He had been throwing dollar bills in the air, and [the other witness] had asked if he could move so that she could retrieve a bill under his foot." Br. of Resp't at 45. There is no evidence of this in the record. The other witness testified that she retrieved a dollar that had been thrown in the air, but she did not testify that she spoke to anyone from the money-throwing group, and she did not observe the shooting or ever attempt to identify a shooter. And neither Brown nor the other witness testified that they ever spoke to or otherwise contacted Donaldson inside the bar.

description of the robber's appearance, including facial features, height, clothing, and voice, and no witness reported a visible weapon." *Id*. at 687. And two of the witnesses identified the robber within a day of the crime, while the third identified him nine days after the robbery. *Id*. at 689. The *Derri* court assigned limited weight to the fact that all three witnesses described the robber with characteristics that were consistent with the defendant's appearance and to the witnesses' high level of certainty in their identifications. *Id*. at 687-88. Overall, the Supreme Court held that the corrupting effect of the suggestive procedure did not "outweigh the additional indicia of reliability present with regard to each witness." *Id*. at 690.

Donaldson drew Brown's attention earlier in the night inside the bar because his group was throwing money in the air. She gave police consistent and accurate descriptions of Donaldson three times within a few hours of the shooting, *before* she saw the Facebook video. She consistently described the shooter as a light-skinned Black man with dreadlocks pulled into a ponytail, wearing a grille in his mouth and a black hoodie. Brown's descriptions were consistent with those other witnesses gave.

Brown also told police that she recognized Donaldson from the group throwing money inside the club before she saw the Facebook video. She identified Donaldson in the Facebook video for police in addition to identifying him in the photo montage. And a defense witness testified that Donaldson was the only person in his group with dreadlocks. Additionally, Brown identified Donaldson from the photo montage three days after the shooting. Her primary concern with his photo in the montage was a difference in skin tone between the person she observed in the bar and parking lot versus his driver's license photo, which a detective noted was a common concern in montages of driver's license photos.

Given Brown's opportunity to view the man who would be the shooter before the crime at a time when she was not experiencing stress, as well as the consistency and accuracy of her description before viewing the Facebook video, and her identification of Donaldson as one of the people throwing money in the bar and then her identification in the Facebook video separate from the photo montage, we conclude that her identification was reliable under the totality of the circumstances. The fact that Brown later underwent therapy that may have affected her memory does not affect the reliability of her pretherapy identifications.

Although the photo montage was impermissibly suggestive because Donaldson was the only person in the montage with dreadlocks, we hold that Brown's identification was sufficiently reliable under the totality of the circumstances. Thus, the admission of the montage identification was not a manifest error affecting a constitutional right that requires reversal.

B.    PRP Regarding Brown's In-Court Identification

In addition to the pretrial identification, Brown also identified Donaldson as the shooter in the courtroom at Donaldson's third trial. When testifying that she also remembered Wilson firing a gun, Brown said for the first time that her memory had been affected by undergoing EMDR therapy in the months after the shooting. Donaldson then moved for a one month continuance to research EMDR therapy and its effects on Brown's testimony, which the trial court denied. The trial court also denied a request to recess for the remainder of the morning so defense counsel could "study up" on EMDR. 12 VRP at 1196.

In his PRP, Donaldson argues the trial court abused its discretion by denying his first motion for a month-long continuance and his second motion for a morning recess. Even though "it is undisputed" that "Brown made several statements to police regarding the shooting before [she

21

started] EMDR therapy," Donaldson contends that the therapy impacted Brown's trial testimony and in-court identification of Donaldson. PRP at 24. He insists that this denied him his right to due process, right to present a defense, right to confront and cross-examine Brown's therapist, and right to effective assistance of counsel.

Donaldson compares EMDR therapy to hypnosis and reasons that the trial court should have excluded "'testimony dependent upon memory that has been enhanced or recovered through EMDR'" until it could determine the reliability of the testimony under the totality of the circumstances. PRP at 32 (quoting *United States v. D.W.B.*, 74 M.J. 630, 642 (N-M. Ct. Crim. App. 2015) (case from the Navy-Marine Court of Criminal Appeals addressing the admissibility of memories recovered through EMDR therapy). Donaldson asserts that the failure to do so "denied him a chance to investigate the surprise testimony about memory distorting therapy of the State's key witness." Appellant's Consol. Reply Br. at 28. Donaldson contends that we must remand for an evidentiary hearing to determine whether he was prejudiced by the lack of evidence that EMDR therapy can create false memories. PRP at 26-29. "To the extent" that his expert "lacks necessary details to fully assess the reliability of Brown's testimony, so did the trial court." Appellant's Consol. Reply Br. at 30.

Even assuming the trial court should have granted a recess to allow Donaldson's counsel time to prepare for cross-examination in light of Brown's discussion of EMDR therapy on direct, this error was not prejudicial. We otherwise disagree with Donaldson's arguments in his PRP.

A personal restraint petitioner claiming constitutional error must demonstrate that they were actually and substantially prejudiced as a result of that error. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016). To demonstrate actual and substantial

prejudice, the petitioner must show that the outcome of the proceeding "would more likely than not have been different had the error not occurred." *State v. Buckman*, 190 Wn.2d 51, 60, 409 P.3d 193 (2018).

The parties cite no Washington case that has addressed the admissibility of testimony potentially affected by EMDR therapy. And there is not consistent caselaw on the closest analogy, testimony about facts recalled during hypnosis. The Ninth Circuit has long held that hypnotically refreshed memories are admissible. *United States v. Awkard*, 597 F.2d 667, 669 (9th Cir. 1979) ("The fact of hypnosis, if disclosed to the jury, may affect the credibility of evidence, but not its admissibility."). In contrast, Washington has barred the admission of testimony "concerning information recalled while under hypnosis," although testimony about "facts recalled prior to hypnosis" remains admissible. *State v. Martin*, 101 Wn.2d 713, 722, 684 P.2d 651 (1984).

The military case Donaldson relies on lists multiple factors to consider in assessing the reliability of post-EMDR testimony, including whether the procedure was "used as a criminal investigative aid, intended to recover memories, or . . . a therapeutic procedure. There is a greater danger of suggestibility in the former two, while there is a lesser danger in the last." *D.W.B.*, 74 M.J. at 643. Courts also consider "[w]hether independent corroborating evidence exists to support the reliability of the recovered memories." *Id*. The remaining factors address the qualifications of the therapist, suggestive circumstances of the therapy, and evidence about the reliability of the procedure. *Id*.

First, even assuming without deciding that Brown created false memories during her EMDR therapy, the affected memories were primarily related to whether Wilson was a shooter. Donaldson asserts that the change in Brown's memories affected the defense's theory that there

was only one shooter: Wilson. But the record shows that Brown identified two shooters to police at the hospital shortly after the shooting and months before she underwent EMDR therapy. Brown described a "possibly Hispanic male" right next to Foster, and then a Black male "who ran up behind later" with dreadlocks and a gold grille. 9 VRP at 862-63. To the extent that the EMDR therapy *may* have affected Brown's memory, Brown repeatedly described a shooter who ran towards the fight, and she identified Donaldson as that shooter *before* she underwent the therapy. She never wavered in her assertions to police that the person who ran up on the fight, later identified as Donaldson, shot at her husband. The sole inconsistency between her accounts pre and post therapy was whether or not she remembered *Wilson* pulling out and firing a gun.

Additionally, Brown's testimony was consistent with her descriptions of Donaldson's appearance and actions that she gave immediately after the shooting, and independent corroborating evidence from other witnesses supports her identification. *See D.W.B.*, 74 M.J. at 643. A friend who described Donaldson the night of the shooting also testified that Donaldson was the shooter, and there was testimony that Percell had previously identified Donaldson as the shooter, although he was unable to do so at the time of trial. Donaldson was the only person in his group with identifiable dreadlocks, and a witness who knew him testified that he ran towards the fistfight immediately before the shooting. Finally, the therapy was therapeutic, a factor the *D.W.B.* court considered to be relevant. *Id*. Thus, Donaldson has not shown that Brown's in-court identification of Donaldson was made unreliable by her EMDR therapy.

Even assuming that the trial court erred by denying the recess to prepare for cross examination in light of Brown's new testimony about her EMDR therapy, Donaldson cannot show prejudice. As explained above, Brown did not waver in her statements that the person who ran up

on the fight shot at her husband. Brown's pre-EMDR statements and identifications of Donaldson were admissible, and she described two shooters to police the night of the shooting. Donaldson's expert has not said that the EMDR therapy Brown received actually affected her testimony, and Donaldson cannot show a substantial probability that he would have been acquitted without Brown's in-court identification. Donaldson primarily argued below that it was prejudicial that Brown identified two shooters after undergoing EMDR therapy, but there was already objective evidence of two shooters in addition to Brown's pre-EMDR recollection of two shooters. Surveillance video showed muzzle flashes associated with two different people, two types of shell casings were recovered from the scene, witnesses reported hearing two guns firing, and different witnesses described one shooter who matched Wilson's description and one who matched Donaldson. Therefore, any error in denying the motions for a continuance or recess was harmless. Because Donaldson cannot show actual and substantial prejudice arising from the alleged error, we deny Donaldson's PRP.

C.      Music Videos

Donaldson next argues that the trial court abused its discretion by admitting videos and still images from music videos that he appeared in.[8] The images in question were offered to show that Donaldson associated with Wilson, sometimes wore a gold grille as described by Brown, and had access to a Glock firearm that may have been used in the shooting. Donaldson argues that the images were irrelevant and that the images allowed speculation that the gun in the video was the murder weapon. He also contends that the State failed to offer evidence about when the videos

---

[8] Both parties state that the videos were admitted but it is unclear from our record when the videos were played for the jury. It is clear that the jury saw still images from the videos.

were made. Thus, he contends that the images were prejudicial because the jury returned special verdicts finding that he was armed with a firearm. We disagree.

First, the State argues defense counsel's motion to admit an entire video under the rule of completeness to show the jury the disclaimer at the end asserting that the guns were all props precludes Donaldson from now arguing the video or stills from it should not have been admitted. But Donaldson sought admission of the entire video only after the trial court decided to admit the still images showing a gun. The fact that defense counsel made a fallback argument that the disclaimer should be provided to the jury along with parts of the video under the rule of completeness, did not amount to waiver or invited error.

Next, Donaldson does not specify which rule of evidence the still images should have been excluded under. He appears to argue based on ER 403, which provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "'When evidence is likely to stimulate an emotional response rather than a rational decision, a danger of unfair prejudice exists.'" *State v. Beadle*, 173 Wn.2d 97, 120, 265 P.3d 863 (2011) (quoting *State v. Powell,* 126 Wn.2d 244, 264, 893 P.2d 615 (1995)). "We review a trial court's balancing of probative value against prejudice for abuse of discretion." *State v. Kennealy*, 151 Wn. App. 861, 890, 214 P.3d 200 (2009). A trial court abuses its discretion when its decision is manifestly unreasonable, based on untenable grounds, or for untenable reasons. *State v. Barry*, 184 Wn. App. 790, 802, 339 P.3d 200 (2014). "'Nonconstitutional error requires reversal only if, within reasonable probabilities, it materially affected the outcome of the trial.'" *Beadle*, 173 Wn.2d at 120-21 (quoting *State v. Russell,* 125 Wn.2d 24, 94, 882 P.2d 747 (1994)).

Donaldson contends that "Washington does not tolerate sheer speculation when it comes to murder weapons." Am. Opening Br. of Appellant at 100. He relies on a Division One case holding that a trial court erred by admitting an expert witness's conclusion that gasoline used to start a fire *probably* came from a gas can found in the defendant's car. *State v. Huynh*, 49 Wn. App. 192, 198, 742 P.2d 160 (1987). Division One held that the expert's analysis technique was not generally accepted by the scientific community, so the testimony was unreliable and irrelevant and should have been excluded. *Id*.

Here, the admitted images from the rap videos were all relevant. First, images of Wilson and Donaldson together were admissible to show a relationship when the State's theory of the case involved accomplice liability. The State's theory of the case was that Donaldson entered the fight to defend Wilson. Evidence that Wilson and Donaldson had a preexisting relationship where they appeared in each other's music videos was thus probative of whether Donaldson would have aided Wilson in a fight. The fact that the images were still images from a rap music video is not by itself unduly prejudicial. Similarly, images of Donaldson wearing a grille were relevant because Brown repeatedly described the shooter as wearing a grille.

An expert testified that she could not tell if the guns in the music video stills were real or props. She stated that the gun Donaldson held in the video was visually consistent with a Glock, and a Glock likely was one of the weapons used to kill Foster. But the jury heard the expert testify that she was not certain the gun in the video was real, something that the jury could consider when weighing the evidence. And even if the images with the Glock were irrelevant, there is no reasonable probability that their admission materially affected the trial's outcome. Even without the images of Donaldson holding a gun, there was direct and circumstantial evidence that

Donaldson was one of the shooters. Surveillance video showed, and witnesses reported, at least two shooters. Three witnesses directly identified Donaldson as a shooter at various points. And other witnesses described a shooter who matched Donaldson's appearance. Thus, Donaldson cannot show a reasonable probability that the admission of the video stills materially affected the outcome of his trial. *Beadle*, 173 Wn.2d at 120-21.

We hold that the trial court did not abuse its discretion by admitting the videos and still images, and even if it did, any error was harmless.

## II. PROSECUTORIAL MISCONDUCT

A.    Statements Donaldson Made During His Arrest

Donaldson argues that the prosecutor violated his right to remain silent by commenting on statements he made when he was arrested. He asserts that the prosecutor invited the jury to infer that Donaldson was guilty because he did not claim innocence. Although Donaldson "does not contest the admissibility of the statement he made to police when he was arrested," he argues that the prosecutor violated his right to remain silent by "contrasting his conduct and [postarrest] silence to that of a hypothetical innocent person" and emphasizing Donaldson's "failure to testify to explain his statements." Appellant's Consol. Reply Br. at 2. We disagree.

Donaldson did not object to the prosecutor's comments during closing. When a defendant fails to object, they waive a prosecutorial misconduct claim unless they show that the comments were improper as well as flagrant and ill intentioned, that a curative instruction would not have remedied any prejudice, and that there is a substantial likelihood the misconduct affected the jury's verdict. *State v. Emery*, 174 Wn.2d 741, 760-61, 278 P.3d 653 (2012). We "'focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting

28

prejudice could have been cured.'" *State v. Gouley*, 19 Wn. App. 2d 185, 201, 494 P.3d 458 (2021) (quoting *Emery*, 174 Wn.2d at 762), *review denied,* 198 Wn.2d 1041, 502 P.3d 854 (2022).

Both the state and federal constitutions guarantee criminal defendants the right to remain silent. U.S. CONST. amend. V; WASH. CONST. art. I, § 9; *State v. Earls*, 116 Wn.2d 364, 374-75, 805 P.2d 211 (1991). Thus, the State cannot use a defendant's silence as substantive evidence of guilt. *State v. Lewis*, 130 Wn.2d 700, 705, 927 P.2d 235 (1996). But a prosecutor "has wide latitude to argue reasonable inferences from the evidence" in closing argument. *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011). We review the prosecutor's arguments "'in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given.'" *State v. Thierry*, 190 Wn. App. 680, 689, 360 P.3d 940 (2015) (quoting *Russell*, 125 Wn.2d at 85-86). Donaldson has not challenged the trial court's findings or conclusions admitting his statements under CrR 3.5, so those findings are verities on appeal. *State v. Gasteazoro-Paniagua*, 173 Wn. App. 751, 755, 294 P.3d 857 (2013).

Donaldson's argument rests on his assertion that the State commented on his right to remain silent when it noted that he failed to claim innocence in statements made during his arrest. He relies on cases addressing pre- and postarrest silence, or cases where a defendant's statements were used to attack their silence. *See Doyle v. Ohio*, 426 U.S. 610, 619, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976) (prosecutor improperly impeached the defendant's exculpatory story at trial with his silence during his arrest); *State v. Burke*, 163 Wn.2d 204, 222, 181 P.3d 1 (2008) (prosecutor improperly commented on the defendant's prearrest silence when the defendant terminated a police interview); *State v. Belgarde*, 110 Wn.2d 504, 512, 755 P.2d 174 (1988) (prosecutor improperly used the defendant's later statement to comment on "his *failure* to make a statement

immediately upon arrest"); *State v. Fricks*, 91 Wn.2d 391, 396, 588 P.2d 1328 (1979) (prosecutor improperly drew attention to the defendant's silence when arrested); *State v. Pinson*, 183 Wn. App. 411, 418-19, 333 P.3d 528 (2014) (prosecutor improperly used defendant's silence during a custodial interrogation as evidence of guilt). None of those cases addresses commentary on statements that were admitted under CrR 3.5.

Here, the trial court admitted Donaldson's statements during his arrest under CrR 3.5, finding that the statements "were spontaneous, made voluntarily, and were not the product of questions or interrogation." CP at 739. An officer then testified that when Donaldson was arrested he said, "'You've got your prize. Let's go,'" and then without prompting added, "'Okay. I'm 30. I've done everything I wanted to do.'" 13 VRP at 1415. In closing, the prosecutor repeated Donaldson's statements, noting that Donaldson's response to being arrested was "not something like 'you've got the wrong guy,'" and was "nothing like you would expect from someone who didn't do it" but was instead "one of absolute defiance and just indifference, talking about how the officers got their prize." 23 VRP at 2938. The prosecutor then highlighted Donaldson's statement, "'I'm 30. I did everything I wanted to do in my life,'" pointing out that Donaldson was "being arrested for murder. . . . for gunning down a 22-year-old. . . . It's really a callous statement because [Foster] didn't get to do everything in his life that he wants to do. . . . These are not the words of someone who didn't do it." 23 VRP at 2938-39. In rebuttal argument, the prosecutor commented that *defense counsel* "didn't have one way of explaining away his client's statements when he was arrested." 23 VRP at 2976.

Prosecutors have wide latitude to comment on the evidence in closing argument. *Thorgerson*, 172 Wn.2d at 448. The prosecutor in this case repeated the admitted statements and

emphasized the context of the statements. The prosecutor did not use the statements to draw attention to or otherwise comment on Donaldson's later exercise of his right to silence. Donaldson has not cited any case holding that a prosecutor is prohibited from commenting on statements admitted under CrR 3.5. And the prosecutor never implied that Donaldson should have testified to explain his statements; he only drew attention to defense counsel's failure to justify the statements in closing. We hold that there was no improper comment on silence.

Donaldson also contends that the prosecutor inflamed the jury's passion and prejudice by characterizing Donaldson's statements as callous and mentioning Foster's young age. Prosecutors overstep their latitude in closing argument if they argue facts that are not in the record or improperly appeal to the passions and prejudices of the jury. *State v. Pierce*, 169 Wn. App. 533, 553, 280 P.3d 1158 (2012). But a "'prosecutor is not muted because the acts committed arouse natural indignation.'" *State v. Borboa*, 157 Wn.2d 108, 123, 135 P.3d 469 (2006) (quoting *State v. Fleetwood*, 75 Wn.2d 80, 84, 448 P.2d 502 (1968)). In *Fleetwood*, a prosecutor did not commit misconduct by emphasizing that a robbery defendant beat an 87-year-old victim. 75 Wn.2d at 84. It is permissible for a prosecutor to note the age of a murder victim and acknowledge the fact that their life ended early. We hold that the comments were not improper.

### B. Argument about Accomplice Liability

Next, Donaldson argues that the prosecutor misstated the law of accomplice liability in closing argument. He relies on the fact that this court reversed Wilson's convictions because the prosecutor from the *first* trial repeatedly misstated the law of accomplice liability in that trial. Donaldson reasons that the prosecutor in his separate third trial made the same incorrect assertions, requiring reversal.

Specifically, Donaldson implies that the jury could have convicted him for the simple act of approaching the fight between Wilson and Foster. Donaldson asserts that there was "remarkably weak" evidence that he was a shooter. Am. Opening Br. of Appellant at 62. Thus, he reasons that "[t]here is no way of knowing whether the jury convicted Donaldson because they thought he was a shooter; or because he was simply an accomplice to Wilson, who was a shooter; or because he was an accomplice to someone else," because no special verdict form "required the jury to indicate which of these factual scenarios it found." *Id*. We disagree.

A prosecutor "commits misconduct by misstating the law." *State v. Allen*, 182 Wn.2d 364, 373, 341 P.3d 268 (2015). "A person is an accomplice of another person in the commission of a crime if . . . [w]ith knowledge that it will promote or facilitate the commission of *the* crime," that person "[a]ids or agrees to aid such other person in planning or committing" *the* crime. RCW 9A.08.020(3)(a), (ii) (emphasis added). A person acts "with knowledge" when they are aware of "a fact, facts, or circumstances," or have "information which would lead a reasonable person in the same situation to believe that facts exist." RCW 9A.08.010(1)(b)(i), (ii).

The prosecutor in the joint first trial repeatedly misstated the law of accomplice liability, asserting that "Wilson and Donaldson had 'a shared mission, *whether or not they realized it*.'" *State v. Wilson*, No. 54241-2, slip op. at 19 (Wash. Ct. App. Dec. 21, 2021). Defense counsel objected to that statement in that trial *Id*. The prosecutor also stated that when each defendant decided "'independently . . . to go after' Foster," they had a "'shared mission,' simply because they went after the same person." *Id*. This improperly ignored the requirement that the person must act with knowledge that it will promote or facilitate the relevant crime in order to be an accomplice. *Id.*

As a preliminary matter, Donaldson asserts that our holding in *Wilson* is "the law of the case," even though Wilson was convicted in a different trial than Donaldson and the prosecutor's statement of the law differed between the two trials. Am. Opening Br. of Appellant at 57. "The law of the case doctrine provides that once there is an appellate court ruling, its holding must be followed in all of the subsequent stages of the same litigation." *State v. Schwab*, 163 Wn.2d 664, 672, 185 P.3d 1151 (2008).

But the prosecutor's explanation of the law in Donaldson's separate third trial, was different from his explanation in the first trial. Here, the prosecutor explained that accomplice liability is triggered "when you knowingly assist someone in the commission of a crime." 23 VRP at 2906-07. "[Y]ou are responsible, not only for your actions, but you're responsible legally for the actions of the person you are assisting." 23 VRP at 2907. Thus, "when the defendant runs up to provide aid to Marshall Wilson, the defendant is not only responsible for his gun and his bullets; he's responsible for Marshall Wilson's gun and Marshall Wilson's bullets as well." *Id.*

Here, the prosecutor did not say that Wilson and Donaldson could be accomplices "*whether or not they realized*" they had a "shared mission." *See Wilson*, slip op. at 19. Defense counsel did not object to the prosecutor's explanation in this case. And counsel did not object to the prosecutor's later comment, "Regardless of whose bullet it was that killed [Foster], you are responsible, not only for your bullets, but of those of your accomplices." 23 VRP at 2942.

Because defense counsel did not object, Donaldson must show that the comments were improper, flagrant, ill intentioned, and prejudicial. *Emery*, 174 Wn.2d at 760-61. We focus on whether any possible prejudice could have been remedied by a curative instruction. *Gouley*, 19 Wn. App. 2d at 201.

A person is an accomplice to a crime if, "[w]ith knowledge that it will promote or facilitate the commission of *the* crime," they aid another person in planning or committing the crime. RCW 9A.08.020(3)(a), (ii). (emphasis added). Although the prosecutor here said "a crime" rather than "the crime," the prosecutor did not mischaracterize the nature of accomplice liability as they did in the first trial. Here, the prosecutor asserted that Donaldson "[ran] up to provide aid" to Wilson by firing a gun at Foster. 23 VRP at 2907. Donaldson ran toward the fight and began shooting, and it was reasonable to infer he was doing so to aid Wilson as his friend. Thus, in context, the prosecutor's statement of the law was not so inaccurate or misleading that an instruction would not have cured any resulting confusion.

Additionally, the jury instructions properly stated the law of accomplice liability, and a jury is presumed to follow the court's instructions unless "the record reflects that the jury considered an improper statement to be a proper statement of the law." *Allen*, 182 Wn.2d at 380. There is no evidence that the jury considered an improper statement of the law. We should hold that, in context, the prosecutor did not commit reversible misconduct while explaining the law of accomplice liability.

Donaldson also argues that his trial counsel was ineffective for failing to object to the alleged prosecutorial misconduct in closing arguments. If a prosecutor's arguments are not improper, then defense counsel's failure to object does not constitute ineffective assistance. *State v. Larios-Lopez*, 156 Wn. App. 257, 262, 233 P.3d 899 (2010). As discussed above, we hold that, in context, the prosecutor's arguments for the most part were not improper. A failure to object when the prosecutor referred to "a crime" rather than "the crime," without more, is not enough to

warrant reversal where the jury instructions were clear. Therefore, counsel did not render ineffective assistance by failing to object.

Finally, Donaldson argues that an accumulation of errors prejudiced him and require a new trial under the cumulative error doctrine. Here, there was no error, so the cumulative error doctrine does not apply.

## III. SAG

### A. Prosecutorial Misconduct

In his SAG, Donaldson argues that the State's opening and closing arguments misstated the evidence and argued facts not in the record. He asserts that Percell, who was expected to identify Donaldson as the shooter, failed to do so in his testimony. He also emphasizes that the murder weapon was never recovered and that it is not clear whether Donaldson or Wilson fired the shot that killed Foster. None of Donaldson's prosecutorial misconduct arguments merit reversal.

We grant prosecutors "'latitude to argue the facts in evidence and reasonable inferences'" from those facts in opening and closing arguments. *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003) (quoting *State v. Smith*, 104 Wn.2d 497, 510, 707 P.2d 1306 (1985)). "But a prosecutor commits reversible misconduct by urging the jury to decide a case based on evidence outside the record." *Pierce*, 169 Wn. App. at 553.

Here, the State presented evidence that Percell had at one point identified Donaldson as one of the shooters, although he was unable to do so by the time of Donaldson's third trial, which took place three and a half years after the shooting. And the State argued a theory of accomplice liability because Foster died from multiple gunshot wounds. The State presented evidence that shell casings fired from two different weapons were recovered from the scene, surveillance video

showed muzzle flashes from two different weapons, and several witnesses identified Donaldson as one of the shooters. Donaldson does not show that the prosecutor urged the jury to convict based on evidence outside the record.

B.      Right to Confrontation

Donaldson also asserts that his right to confrontation was violated when the trial court found a witness unavailable and allowed her prior testimony to be read into the record. We disagree.

ER 804(b)(1) provides that the hearsay rule does not exclude the prior testimony of an unavailable witness from "another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." A witness is unavailable if they are "absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means." ER 804(a)(5).

Here, the witness testified at Donaldson's first trial and was cross-examined by defense counsel, who remained Donaldson's lawyer at his third trial. The witness then refused to cooperate with the State to appear for the third trial. The trial court found the witness unavailable under ER 804(a) when the State explained that she refused to travel to attend trial and refused to communicate with the State. Donaldson does not show how the trial court erred in finding the witness unavailable when the State repeatedly tried to contact her and procure her appearance, including arranging a plane ticket. And Donaldson does not establish that his defense counsel lacked the opportunity or motive to develop the witness's testimony on cross-examination in the first trial. Donaldson's right to confrontation challenge fails.

No. 55942-1-II

CONCLUSION

We affirm Donaldson's convictions and deny his PRP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Lee, J.

Veljacic, J.

37